656 F.2d 705
 211 U.S.App.D.C. 116, 8 Fed. R. Evid. Serv. 1139,
7 Media L. Rep. 1121
 Anthony T. ZERILLI and Michael Polizzi, Appellants,
v.
William French SMITH, Attorney General of the United States, et al.
Anthony J. ZERILLI, Appellant,
v.
William French SMITH, Attorney General of the United States, et al.
 Nos. 79-2466, 79-2480.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 16, 1981.
Decided April 13, 1981.
As Amended Oct. 20, 1981.
 
 Sol Rosen, Washington, D. C., for appellants.
 Anthony C. DiGioia, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., and John A. Terry and John R. Fisher, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellees.
 Before WRIGHT and ROBB, Circuit Judges, and PENN,* District Judge.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 Concurring statement filed by Circuit Judge ROBB.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 These cases were consolidated for hearing.[1] We shall, however, state our reasons for their disposition separately and issue a separate judgment in each case.
 
 
 2
 I. ZERILLI AND POLIZZI V. SMITH, NO. 79-2466
 
 
 3
 Appellants Anthony T. Zerilli and Michael Polizzi brought an action under the Privacy Act[2] and the Fourth Amendment against the Attorney General of the United States, the Director of the Federal Bureau of Investigation, and the Department of Justice. They contended that employees of the Department of Justice violated their constitutional and statutory rights by leaking to the Detroit News transcripts of conversations in which appellants discussed various illegal activities. These transcripts had originally been obtained by the Justice Department as the result of electronic surveillance conducted by the Federal Bureau of Investigation. According to appellants, a series of articles on organized crime written by reporter Seth Kantor and other members of the Detroit News staff were based on information obtained from the transcripts.[3] When appellants deposed Kantor he refused to reveal his sources, relying on a qualified reporter's privilege under the First Amendment. Appellants moved to compel discovery.[4] After denying appellants' motion,[5] the District Court granted a Government motion for summary judgment.[6] In this appeal Zerilli and Polizzi challenge both of these decisions. Because we believe that in this case the First Amendment interest in protecting a news reporter's sources outweighs the interest in compelled disclosure, we affirm the District Court's decision to deny the motion to compel discovery. We also affirm the decision to grant summary judgment in favor of the Government.
 
 A. Facts
 
 4
 During criminal proceedings brought against Zerilli and Polizzi in the District Court for the Southern District of California in 1971,[7] the Government revealed that the FBI had planted a listening device on the premises of the Home Juice Company in Detroit, Michigan and that as a result of this electronic surveillance it possessed logs of conversations in which appellants discussed various illegal activities.[8] The parties stipulated that the listening device had been installed without a warrant in violation of the Fourth Amendment.[9] Subsequently, in a separate proceeding, United States District Judge Gus J. Solomon ordered that the logs be sealed, forbidding their dissemination to the public.[10] Before they were sealed, however, appellants and their attorneys were allowed to review the logs.[11] The documents remain under seal at the Department of Justice, the only government agency possessing either the original logs or copies of the transcripts.
 
 
 5
 In 1976 the Detroit News published a series of articles entitled "Inside the Mafia" which discussed organized crime in Detroit.[12] The articles identified appellant Zerilli as the Detroit mob leader and appellant Polizzi as a mob cohort.[13] They purported to be based on the logs made by the FBI and contained many references to the logs.[14] In March 1977 appellants filed their Privacy Act suit. They alleged that the logs were in appellees' exclusive possession and that employees of appellees had violated their statutory rights by leaking them to the Detroit News. They sought two million dollars each as damages.[15] Later they filed an amended complaint seeking damages in a Bivens-type action,[16] alleging that appellees had violated their Fourth Amendment rights.[17] They stipulated that they were not seeking damages for the unlawful bugging of the Home Juice Company. Rather, they stated that their Fourth Amendment claim was based on the subsequent disclosure of the logs to the press.[18]
 
 
 6
 Shortly after filing their suit appellants propounded a set of seven interrogatories upon the Government.[19] In one of these interrogatories they asked for a description of an investigation the Assistant Attorney General in charge of the Criminal Division had conducted to determine whether any Department of Justice employees were responsible for the leak.[20] Appellees responded that the investigation had not uncovered any evidence suggesting that a Justice Department employee had disclosed the transcripts to the media.[21] Several memoranda concerning the investigation were also provided.[22] In response to other interrogatories appellees stated that to their knowledge no Government employee had disclosed the logs to the Detroit News.[23] They also provided the names of the four Justice Department employees who knew most about the logs.[24] Previously, during the 1971 criminal trial, the Department of Justice had provided appellants with a list of all Government officials who had access to the wiretap logs.[25]
 
 
 7
 Appellants did not seek further discovery from the Government; in particular, although they might have uncovered valuable information by questioning the employees who had access to the logs, they did not depose any of these individuals. In fact, in a subsequent pleading appellants stated:
 
 
 8
 The Department of Justice has certified to the Court that as a result of an internal investigation no individual connected with the Department of Justice released these documents to the Detroit News or its staff members. Counsel for the plaintiffs accept th(is) representation * * * without deeming it necessary to depose any individual employee of the Department of Justice or the F.B.I.
 
 
 9
 Reply to Opposition to Compel Discovery, Record in No. 79-2466, Document 33 at 2-3. Appellants later claimed that they accepted the Justice Department's representations, not because they actually conceded the truth of those representations, but for tactical reasons only. According to appellants, they wished to depose the Detroit News reporters regarding the identity of the individuals who had released the wiretap logs. But they believed that before they could overcome the reporters' qualified First Amendment privilege not to disclose confidential news sources they would be required to show that they had exhausted any alternative sources of information. They hoped their statement accepting the Justice Department's representations would satisfy this requirement.[26] During oral argument on appeal counsel for Zerilli and Polizzi also claimed that they chose not to question the Government employees because depositions would have been time-consuming and costly and would probably have been unproductive.
 
 
 10
 The set of seven interrogatories propounded on the Justice Department was the only discovery taken by appellants within the time originally allotted for discovery. After the time allotted had expired appellants requested and obtained special leave to take the deposition of Seth Kantor, one of the authors of the Detroit News series on organized crime.[27] At the deposition appellants asked a number of questions designed to elicit Kantor's sources. Kantor refused to answer, relying on a First Amendment privilege not to disclose information tending to identify confidential sources.[28] Appellants then moved to compel discovery under Rule 37, Fed.R.Civ.P., claiming that their rights as civil litigants superseded the reporter's qualified First Amendment privilege.[29] In a careful opinion the District Court denied this motion, stating that it was unable to find a compelling interest sufficient to warrant subordination of First Amendment values. The court emphasized appellants' failure to exhaust alternative sources of information. Zerilli v. Bell, 458 F.Supp. 26 (D.D.C.1978).
 
 
 11
 Appellees filed a motion for summary judgment with respect to the Privacy Act claim in September 1978, arguing that there was no genuine dispute as to any material fact. As support for their motion they cited: (1) their answers to appellants' interrogatories in which they stated that no Justice Department employee had released the logs to the Detroit News; (2) appellants' concession that these representations were true; and (3) appellants' answers to interrogatories propounded by the Government, in which they admitted that the wiretap logs had not been in the exclusive possession of the Justice Department.[30] In their opposition to the motion for summary judgment appellants contended that there was a genuine issue concerning whether appellees had leaked the logs to the Detroit News.[31] They pointed to the affidavits of their attorneys in the 1971 criminal trial, in which the attorneys stated that they had not released the logs.[32] As for the statement in which they accepted the representations of the Government regarding its internal investigation, it was at this stage of the litigation that appellants first argued that they made this concession only so they could claim they had exhausted alternative sources before seeking to depose Seth Kantor.[33] Finally, appellants argued that at the very least, rather than granting the motion for summary judgment, the District Court should provide them an opportunity to take further discovery.[34]
 
 
 12
 After refusing to allow further discovery, the District Court granted the Government motion for summary judgment with respect to the Privacy Act claim. The court stated:
 
 
 13
 Discovery in this action closed well over a year ago, and plaintiffs have failed to rebut defendants' statements negating disclosure with any credible evidence at all. Thus, the only thing the record before this Court shows is that the Department of Justice has conducted an internal investigation that turned up no information of any type of disclosure. Plaintiffs are therefore left with bald allegations of wrongful disclosure by defendants. * * *
 
 
 14
 Memorandum Order, Record in No. 79-2466 Document 57 (filed January 30, 1979). The Privacy Act claim was dismissed.[35]
 
 
 15
 The District Court later granted summary judgment in favor of the Government with respect to the Fourth Amendment claim.[36] Describing the Fourth Amendment claim as "merely a new legal characterization of the same factual circumstances"[37] underlying the Privacy Act claim, the court again stated that appellants had done no more than provide "bald allegations of wrongful disclosure by defendants."[38] Just as these allegations would not support the Privacy Act claim, so they would not support the Fourth Amendment claim.
 
 B. The Reporter's Privilege
 
 16
 Appellants argue that the District Court erred when it denied their motion to compel Kantor to disclose his confidential sources. They claim that the First Amendment reporter's privilege should not prevail, since their interest in disclosure outweighs any public interest in protecting the sources. We begin by noting that the scope of review in this case is narrowly circumscribed. A motion to compel discovery is committed to the discretion of the trial court, and our function on appeal is solely to determine whether the trial court abused its discretion in entering the challenged order. See, e. g., Baker v. F & F Investment, 470 F.2d 778 (2d Cir. 1972), cert. denied, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); Carter v. Baltimore & Ohio R. Co., 152 F.2d 129 (D.C.Cir.1945); Montecatini Edison S. p. A. v. E. I. du Pont de Nemours & Co., 434 F.2d 70 (3d Cir. 1970); Tiedman v. American Pigment Corp., 253 F.2d 803 (4th Cir. 958). Given the record before us here, we must conclude that the District Court was well within the ambit of its discretionary authority when it denied appellants' motion to compel discovery.
 
 
 17
 Compelling a reporter to disclose the identity of a confidential source raises obvious First Amendment problems. The First Amendment guarantees a free press primarily because of the important role it can play as "a vital source of public information." Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660 (1936). "The press was protected so that it could bare the secrets of government and inform the people." New York Times Co. v. United States, 403 U.S. 713, 717, 91 S.Ct. 2140, 2143, 29 L.Ed.2d 822 (1971) (Black, J., concurring). Without an unfettered press, citizens would be far less able to make informed political, social, and economic choices. But the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired.[39] Compelling a reporter to disclose the identity of a source may significantly interfere with this news gathering ability; journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant.[40]
 
 
 18
 In Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Supreme Court held that a journalist does not have an absolute privilege under the First Amendment to refuse to disclose confidential sources to a grand jury conducting a criminal investigation, despite the potential interference with news gathering. The Court justified this decision by pointing to the traditional importance of grand juries and the strong public interest in effective criminal investigation. It recognized, however, that because news gathering is essential to a free press, it deserves some First Amendment protection. Thus the Court indicated that a qualified privilege would be available in some circumstances even where a reporter is called before a grand jury to testify. 408 U.S. at 707, 92 S.Ct. at 2669.[41] Moreover, Justice Powell, who cast the deciding vote in Branzburg, wrote a concurring opinion in which he stated that courts can determine whether a privilege applies by using a balancing test:
 
 
 19
 The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.
 
 
 20
 Id. at 710, 92 S.Ct. at 2671 (footnote omitted).
 
 
 21
 Although Branzburg may limit the scope of the reporter's First Amendment privilege in criminal proceedings, this circuit has previously held that in civil cases, where the public interest in effective criminal law enforcement is absent, that case is not controlling. Carey v. Hume, 492 F.2d 631, 636 (D.C.Cir.), cert. dismissed, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974).[42] In Carey we considered the question whether a reporter being sued for libel could refuse to reveal the identity of confidential sources who provided the information on which the allegedly libelous news story was based. We decided that the circumstances of that case did not warrant application of a First Amendment privilege. We indicated, however, that a qualified reporter's privilege under the First Amendment should be readily available in civil cases. An approach similar to that described by Justice Powell in Branzburg was adopted. We held that to determine whether the privilege applies courts should look to the facts of each case, weighing the public interest in protecting the reporter's sources against the private interest in compelling disclosure. 492 F.2d at 636.[43] Every other circuit that has considered the question has also ruled that a privilege should be readily available in civil cases, and that a balancing approach should be applied. See Riley v. City of Chester, 612 F.2d 708, 715-716 (3d Cir. 1979) (upholding assertion of privilege); Silkwood v. Kerr-McGee Corp., 563 F.2d 433, 436-438 (10th Cir. 1978) (same); Baker v. F & F Investment, supra, 470 F.2d at 783 (same); Cervantes v. Time, Inc., 464 F.2d 986 (8th Cir. 1972) (same); Miller v. Transamerican Press, Inc., 621 F.2d 721, 725 (5th Cir. 1980) (ruling that privilege does not prevail); see also Democratic Nat'l Committee v. McCord, 356 F.Supp. 1394, 1398 (D.D.C.1973) (upholding privilege); Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Co., 455 F.Supp. 1197, 1203 (N.D.Ill.1978) (same); Altemose Construction Co. v. Building & Construction Trades Council of Philadelphia, 443 F.Supp. 489, 491 (E.D.Pa.1977) (same); Gilbert v. Allied Chemical Corp., 411 F.Supp. 505, 508 (E.D.Va.1976) (same).[44]
 
 
 22
 In general, when striking the balance between the civil litigant's interest in compelled disclosure and the public interest in protecting a newspaper's confidential sources, we will be mindful of the preferred position of the First Amendment and the importance of a vigorous press. Efforts will be taken to minimize impingement upon the reporter's ability to gather news. Carey v. Hume, supra, 492 F.2d at 639. Thus in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege.[45] Indeed, if the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished. Unless potential sources are confident that compelled disclosure is unlikely, they will be reluctant to disclose any confidential information to reporters.[46]
 
 
 23
 A number of more precise guidelines can be applied to determine how the balance should be struck in a particular case. The civil litigant's need for the information he seeks is of central importance. If the information sought goes to "the heart of the matter," Carey v. Hume, supra, 492 F.2d at 636,[47] that is, if it is crucial to his case, then the argument in favor of compelled disclosure may be relatively strong. See also Miller v. Transamerican Press, Inc., supra, 621 F.2d at 726. In Carey v. Hume, for example, the privilege was not recognized in part because the identity of the reporter's source was central to the plaintiff's proof in his libel action.[48] On the other hand, if the information sought is only marginally relevant, disclosure may be very difficult to justify. See Baker v. F & F Investment, supra, 470 F.2d at 783-784 (recognizing privilege in part because information sought was not important).[49]
 
 
 24
 The efforts made by the litigants to obtain the information from alternative sources is also of central importance. Even when the information is crucial to a litigant's case, reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information. As we stated in Carey v. Hume, supra, 492 F.2d at 638, "The values resident in the protection of the confidential sources of newsmen certainly point towards compelled disclosure from the newsman himself as normally the end, and not the beginning, of the inquiry." See also Riley v. City of Chester, supra, 612 F.2d at 717-718; Silkwood v. Kerr-McGee Corp., supra, 563 F.2d at 430; Baker v. F & F Investment, supra, 470 F.2d at 784; Miller v. Transamerican Press, Inc., supra, 621 F.2d at 726. To be sure, there are some limits to the obligation to pursue alternative sources. In Carey, for example, the reporter being sued had stated that his source was an employee of the national headquarters of the United Mine Workers of America. We decided that the litigant need not have deposed every one of the UMWA's employees. Nonetheless, the obligation is clearly very substantial. In Carey we suggested that an alternative requiring the taking of as many as 60 depositions might be a reasonable prerequisite to compelled disclosure. Carey v. Hume, supra, 492 F.2d at 639.[50]
 
 
 25
 A distinction can also be drawn between civil cases in which the reporter is a party, as in a libel action, and cases in which the reporter is not a party. When the journalist is a party, and successful assertion of the privilege will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure. As we suggested in Carey v. Hume, supra, 492 F.2d at 634, 636-639, this will be particularly true in libel cases involving public officials or public figures where the rule of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), applies. Plaintiffs in those cases must prove both that the allegedly defamatory publication was false, and that it was made with "actual malice." Proof of actual malice will frequently depend on knowing the identity of the newspaper's informant, since a plaintiff will have to demonstrate that the informant was unreliable and that the journalist failed to take adequate steps to verify his story. Protecting the identity of the source would effectively prevent recovery in many Times -type libel cases. See Carey v. Hume, supra; Miller v. Transamerican Press, Inc., supra.[51] We take care to point out, however, that disclosure should by no means be automatic in libel cases. Where other relevant factors suggest disclosure is inappropriate, the privilege should prevail. See Cervantes v. Time, Inc., supra (ruling that privilege should prevail in libel case where information sought was not crucial).
 
 
 26
 Applying these guidelines to the facts of the case before us, we readily find that the District Court did not abuse its discretion when it concluded that a qualified First Amendment privilege should apply. It is true that appellants' suit is not frivolous. Moreover, the information they seek is crucial to their case. The success of their Privacy Act and Fourth Amendment claims may depend on the identities of the individuals who leaked the wiretap logs to Kantor. But appellants clearly have not fulfilled their obligation to exhaust possible alternative sources of information.[52] In response to appellants' interrogatories the Department of Justice provided a list of the names of four employees who knew most about the wiretap logs. During the 1971 criminal trial the Government also provided a list of employees who had been given access to the transcripts. Yet appellants made no attempt to depose any of these individuals. Appellants cannot escape their obligation to exhaust alternative sources simply because they feared that deposing Justice Department employees would be time-consuming, costly, and unproductive. At the very least, they could have deposed the four employees who had the greatest knowledge about the logs.[53] It is quite possible that interviewing these four individuals could have shed further light on the question whether the Justice Department was responsible for the leaks.[54] Nor can appellants escape their obligation to exhaust alternatives because they were willing to accept the Justice Department's statement that an internal investigation had not revealed any wrongdoing by employees. Permitting this kind of gamesmanship would poorly serve the First Amendment values at stake here.[55] Finally, we note that this is not a case like Carey v. Hume, supra, in which a reporter is being sued for libel under the rule of New York Times Co. v. Sullivan, supra. Nor is Kantor a party to these Privacy Act and Fourth Amendment claims. He is not asserting the privilege in order to protect himself from liability.
 
 C. Propriety of Summary Judgment
 
 27
 Appellants argue that the District Court also erred when it granted summary judgment in favor of the Government with respect to their Privacy Act and Fourth Amendment claims. They claim that a genuine issue of material fact does exist. The Government has alleged that it did not release the logs. Appellants allege that neither they nor their attorneys in the earlier criminal trial released the documents. Thus, according to appellants, there is a dispute about who was responsible for the leak and this dispute must be resolved at trial. We disagree; we believe that the District Court's decision to grant summary judgment was correct.
 
 
 28
 Summary judgment was clearly appropriate if appellants intended to concede the absence of wrongdoing on the part of Justice Department employees when they stated that they accepted the Government's representations with respect to its internal investigation. If this interpretation of their statement is correct,[56] then appellants have conceded their entire case. But summary judgment was appropriate even if we accept appellants' claim that this statement was made solely for tactical reasons. Under Rule 56(e) a party against whom a motion for summary judgment is made may not simply rest upon the mere allegations or denials of his pleadings. Instead, his response must set forth, by affidavits or other evidence, specific facts showing that there is a genuine issue for trial.[57] Here, appellants have failed to meet this obligation. It is true that appellants provided affidavits in which they and their attorneys in the 1971 criminal trial state that they did not leak the documents. But the affidavits simply restate the allegations of the pleadings, where appellants claim that they were not responsible for disclosing the logs to the press.[58] Appellants have not made a serious effort to fulfill their obligation under Rule 56(e) to provide specific facts. If appellants had attempted to uncover evidence supporting their claims, we might view this case in a different light. But during the discovery stage of these proceedings they demonstrated a remarkable lack of energy. Again, no attempt was made to depose any of the Department of Justice employees who had access to the tapes. Appellants have also failed to demonstrate, for example, that none of the court personnel who would have had access to these documents during the earlier criminal trial were not responsible for the disclosures to the press.[59] See Thompson v. Evening Star Newspaper Co., 394 F.2d 774, 777 (D.C.Cir.), cert. denied, 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968); Continental Casualty Co. v. American Security Corp., 443 F.2d 649, 651 n.7 (D.C.Cir.1970), cert. denied, 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (1971). See generally 10 C. Wright & A. Miller, Federal Practice and Procedure § 2738 (1973).
 
 
 29
 Appellants suggest that, at the very least, the District Court should have allowed further discovery before granting summary judgment in favor of the Government. Here again, we believe that the District Court's action was appropriate. First, appellants' request for further discovery was not accompanied by the affidavit required under Rule 56(f). Under that rule a court may deny summary judgment or order a continuance to permit discovery when the party opposing the motion presents an affidavit setting forth reasons showing why he is currently unable to present affidavits supporting his opposition.[60] In any event, even if appellants had complied with Rule 56(f), a continuance would not have been justified, since appellants had ample opportunity prior to the motion for summary judgment to take discovery.[61]
 
 II. ZERILLI V. SMITH, NO. 79-2480
 
 30
 This appeal involves a Freedom of Information Act suit brought by Zerilli, in which Polizzi did not participate. In 1975 Zerilli requested all records pertaining to him that were maintained by the Department of Justice. This request was forwarded to the FBI, the Criminal Division of the Justice Department, the Board of Parole, and the Bureau of Prisons.[62] The Criminal Division released some documents in May 1977.[63] Several weeks later appellant filed suit in the District Court seeking disclosure of the withheld documents.[64] After the suit had been filed the FBI released numerous documents.[65] In May 1979, after filing the supporting affidavits and indices required by Vaughn v. Rosen, 484 F.2d 820 (D.C.Cir.1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), the Government filed a motion for summary judgment. In its motion it argued that each document withheld and every deletion from documents that had been released was exempt from disclosure under one or more Freedom of Information Act exemptions.[66] On June 12, 1979 the parties stipulated, with the approval of the court, that Zerilli would have until June 30, 1979 to respond to the motion. On July 10, 1979 the District Court approved another stipulation extending the time for response until July 31, 1979. On September 7 the District Court entered an order extending the time for response to September 17, 1979.[67]
 
 
 31
 Appellant finally responded to the motion on September 17, 1979, when he filed a one-page document entitled "Opposition to Motion for Summary Judgment." No legal arguments were presented in this document; appellant simply stated that he vigorously opposed the motion and "rel(ied) on the pleadings * * * and the various documents filed with the Court * * *."[68] He also requested an extension of time until October 16, 1979 to file the memorandum of points and authorities required by Local Rule 1-9(d),[69] stating that he had been busy with other commitments.[70] The District Court never ruled on the request for an extension of time. However, appellant never filed a memorandum of points and authorities.[71] On October 26, 1979, well after the extension of time would have expired even if it had been granted, the District Court decided in favor of the Government on its motion for summary judgment. Relying on the entire record as well as on appellant's failure to file any controverting affidavits or other materials in opposition and on his failure to file the memorandum of points and authorities required by Local Rule 1-9(d), the court treated the Government motion as conceded.[72]
 
 
 32
 Appellant Zerilli claims that the District Court erred when it granted summary judgment in favor of the Government. Once again, we agree with the District Court's decision. Appellant's one-page "Opposition to Motion for Summary Judgment" clearly failed to satisfy the requirements of Local Rule 1-9(d). That rule provides that if a party opposing a motion fails to file a statement of points and authorities, the court may treat the motion as conceded.[73] The time prescribed by this rule for filing the statement of points and authorities is ten days. Here, appellees filed their motion for summary judgment and three extensive Vaughn v. Rosen affidavits and indices in May 1979.[74] Zerilli filed his opposition four months later, after three extensions of time. His opposition did not cite any authorities or contain any legal argument. Instead, he merely stated that he "vigorously oppose(d) the motion" and that he was relying upon the "pleadings * * * and the various documents filed with the Court."[75] Under the circumstances, the District Court properly treated the Government motion as conceded. It is true that in his opposition appellant requested an extension of time until October 16, 1979 so that he could file a supporting memorandum. But even though the court never specifically ruled on this motion, it did not grant the motion for summary judgment until October 26, 1979, eleven days after the requested extension would have expired. Moreover, the memorandum was never filed.[76]
 
 III. CONCLUSION
 
 33
 For the reasons stated in this opinion, the judgments of the District Court in Nos. 79-2466 and 79-2480 are
 
 
 34
 Affirmed.
 
 ROBB, Circuit Judge, concurring:
 
 35
 I concur in the result, upon the ground that before asking the court to compel answers from the reporter Kantor the plaintiffs failed to explore alternative sources of information that were plainly available to them. This failure justified the court's refusal to compel answers from Kantor.
 
 
 36
 I do not join in the broad statements concerning the "reporter's privilege" set out in the majority opinion. In my judgment this sweeping exposition is unnecessary to the decision.
 
 
 
 *
 Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976)
 
 
 [1]
 Appellants filed separate briefs in April 1980. In July 1980 this court granted a Government motion to consolidate. The Government subsequently filed a single brief in which it presented its arguments in both cases
 
 
 [2]
 5 U.S.C. § 552a (1976). The Privacy Act provides, in pertinent part, that "(n)o agency shall disclose any record * * * except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains * * *." 5 U.S.C. § 552a(b)
 
 
 [3]
 Appellants' Complaint ("Original Complaint") and Amended Complaint ("Amended Complaint") are reprinted in Joint Appendix to No. 79-2466 (JA 1) at 7-9 and 13-14 respectively
 
 
 [4]
 See Motion to Compel Discovery, Record in No. 79-2466 (R. 1) Document (Doc.) 26
 
 
 [5]
 See Zerilli v. Bell, 458 F.Supp. 26 (D.D.C.1978)
 
 
 [6]
 See Memorandum-Order, filed January 30, 1979, R. 1 Doc. 57 (granting summary judgment with respect to Privacy Act claim); Memorandum-Order, filed November 30, 1979, reprinted in JA 1 at 15-16 (granting summary judgment with respect to Fourth Amendment claim)
 
 
 [7]
 United States v. Polizzi et al. (C.D.Cal. 75-329, DWW). Zerilli, Polizzi, and others were convicted of conspiracy to violate the Federal Travel Act, 18 U.S.C. § 1952 (1976), and of substantive violations of that statute. Their convictions were affirmed on appeal. United States v. Polizzi, 500 F.2d 856 (9th Cir. 1974)
 
 
 [8]
 See United States v. Polizzi, supra note 7, 500 F.2d at 909. The electronic surveillance was conducted between 1962 and 1965
 
 
 [9]
 See id. Thus the tapes were not submitted as evidence at the trial. After trial an Alderman hearing, Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), was conducted, at which it was determined that the evidence on which the convictions were based had not been tainted by the illegal electronic surveillance. 500 F.2d at 909
 
 
 [10]
 See appellees' brief at 6 n.8
 
 
 [11]
 See United States v. Polizzi, supra note 7, 500 F.2d at 909. The existence of the transcripts was made public as early as 1972, however. During the criminal trial a reporter for the Los Angeles Times learned of the tapes when he read a copy of the court reporter's daily transcript. Shortly thereafter the Times published an article entitled "Transcript Shows U.S. Bugged Vegas Defendants' Mafia Talks." Id. at 911. Additionally, according to articles published in the Detroit News, the existence of the tapes was disclosed during the 1976 trial of another organized crime figure, Anthony Giacalone. See Kantor Deposition Exhibit (Exh.) 1A at 1, 28 (Detroit News article). Court personnel during the 1971 criminal trial would also have had access to the logs
 
 
 [12]
 See Kantor Deposition Exhs. 1A and 1E, R. 1 Doc. 28
 
 
 [13]
 See id. 1D at 1, 12A, 1A at 14A, R. 1 Doc. 28
 
 
 [14]
 See id. 1A-1E, R. 1 Doc. 28
 
 
 [15]
 See Original Complaint, JA 1 at 7-9
 
 
 [16]
 Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)
 
 
 [17]
 Amended Complaint, JA 1 at 13-14
 
 
 [18]
 See R. 1 Doc. 62. The stipulation, which was entered into on November 29, 1979, states, in pertinent part:
 
 
 [1]
 That plaintiffs' Amended Complaint * * * which added a second count based on the Fourth Amendment * * * pertains only to the issue of whether Department of Justice employees violated the plaintiffs' Fourth Amendment rights by allegedly disclosing to the Detroit News newspaper the logs of telephone conversations of plaintiffs previously recorded by the Federal Bureau of Investigation
 
 
 [2]
 That plaintiffs' Amended Complaint does not raise for litigation the question of whether plaintiffs' Fourth Amendment rights were violated by the Federal Bureau of Investigation's recording of the pertinent telephone conversations
 
 
 [19]
 See Plaintiffs' Interrogatories, R. 1 Doc. 8
 
 
 [20]
 See id. (Interrogatory 6). The investigation was apparently initiated in response to a letter written by one of appellants' attorneys to the Justice Department, in which the attorney charged that the Government had released the logs to the press. See JA 1 at 11; Defendants' Answers to Plaintiffs' Interrogatories, R. 1 Doc. 17 (attached memoranda)
 
 
 [21]
 See Defendants' Answers to Plaintiffs' Interrogatories, R. 1 Doc. 17 (answer to Interrogatory 6)
 
 
 [22]
 See id. (attached memoranda)
 
 
 [23]
 See id. (answers to Interrogatories 3, 4, 5)
 
 
 [24]
 See id. (answer to Interrogatory 1)
 
 
 [25]
 See United States v. Polizzi, supra note 7, 500 F.2d at 912-913. The record does not reveal how many names were on this list
 
 
 [26]
 See Supplemental Memorandum in Opposition to Government's Motion for Summary Judgment, R. 1 Doc. 55
 
 
 [27]
 See Zerilli v. Bell, supra note 5, 458 F.Supp. at 27. Several days after obtaining special leave to depose Seth Kantor, plaintiffs noted the depositions of three staff members of the Detroit News who also participated in writing the articles on organized crime. The Government moved for a protective order to end discovery, arguing that the depositions were scheduled beyond the time prescribed for discovery. Appellants then made an oral motion to extend discovery for the purpose of taking these depositions. This motion was denied. See id. See also R. 1 Docs. 19-24
 
 
 [28]
 See Seth Kantor's Statement of Points and Authorities in Opposition to Plaintiffs' Motion to Compel Discovery, Exh. I, R. 1 Doc. 30 (listing questions Kantor refused to answer)
 
 
 [29]
 See Motion to Compel Discovery, R. 1 Doc. 26
 
 
 [30]
 See Defendants' Motion for Summary Judgment, R. 1 Doc. 49
 
 
 [31]
 See Opposition to Motion for Summary Judgment, R. 1 Doc. 54 (filed Sept. 7, 1978); Supplemental Memorandum in Opposition to Government's Motion for Summary Judgment, R. 1 Doc. 55 (filed Oct. 10, 1978)
 
 
 [32]
 See Supplemental Memorandum in Opposition to Government's Motion for Summary Judgment, R. 1 Doc. 55. In their memoranda appellants did not refer to their own affidavits in which they stated that they had not released or consented to release of the logs. These affidavits, filed with the Original Complaint, are reprinted in JA 1 at 10, 12
 
 
 [33]
 See Supplemental Memorandum in Opposition to Government's Motion for Summary Judgment, R. 1 Doc. 55; text accompanying note 26 supra
 
 
 [34]
 See Opposition to Motion for Summary Judgment, R. 1 Doc. 54; Supplemental Memorandum in Opposition to Government's Motion for Summary Judgment, R. 1 Doc. 55
 
 
 [35]
 Id. At the same time the court denied appellants' motion to reopen discovery. Appellants had argued that further discovery was justified because they had amended their complaint to include a Fourth Amendment claim. See id
 
 
 [36]
 Memorandum-Order, filed November 30, 1979, reprinted in JA 1 at 15-16
 
 
 [37]
 Id. at 15
 
 
 [38]
 Id. at 16
 
 
 [39]
 The Supreme Court explicitly acknowledged the existence of First Amendment protection for news gathering in Branzburg v. Hayes, 408 U.S. 665, 681, 707, 92 S.Ct. 2646, 2656, 2669, 33 L.Ed.2d 626 (1972)
 
 
 [40]
 This relationship has been recognized by the Supreme Court, see Branzburg v. Hayes, supra note 39, 408 U.S. at 693-695, 92 S.Ct. at 2662-2663. See also Riley v. City of Chester, 612 F.2d 708, 714 (3d Cir. 1979); Carey v. Hume, 492 F.2d 631, 636 (D.C.Cir.), cert. dismissed, 417 U.S. 938, 94 S.Ct. 2636, 40 L.Ed.2d 305 (1974); Baker v. F & F Investment, 470 F.2d 778, 782 (2d Cir. 1972), cert. denied, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); see generally Note, Reporters and Their Sources: The Constitutional Right to a Confidential Relationship, 80 Yale L. J. 317, 329-334 (1970)
 
 
 [41]
 The Court stated:
 (N)ews gathering is not without its First Amendment protections, and grand jury investigations(,) if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment. Official harassment of the press undertaken not for the purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth.
 Branzburg v. Hayes, supra note 39, 408 U.S. at 707-708, 92 S.Ct. at 2669-2670 (footnote omitted). Justice Powell added, in his concurring opinion, that if a newsman "is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation," he may be entitled to First Amendment protection. Id. at 710, 92 S.Ct. at 2671 (Powell, J., concurring).
 
 
 [42]
 The Supreme Court's opinion in Branzburg v. Hayes, supra note 39, contains much language suggesting that its holding is confined to the grand jury or criminal trial context. The Court stated, for example:
 On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial.
 408 U.S. at 690-691, 92 S.Ct. at 2661.
 
 
 [43]
 More precisely, we held in Carey that the balancing approach employed by the Second Circuit in Garland v. Torre, 259 F.2d 545 (2d Cir.), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958), which was also a civil defamation action, survived the Supreme Court's decision in Branzburg. See Carey v. Hume, supra note 40, 492 F.2d at 636. For a more complete description of Garland, see note 47 infra
 
 
 [44]
 It is also helpful to compare United States v. Liddy, 354 F.Supp. 208 (D.D.C.1972). In that case the District Court held that Branzburg ordinarily bars assertion of a reporter's privilege in the context of a criminal trial. It went on to state, however, that "First Amendment values will weigh differently in civil and criminal actions," and that it saw "little relevance in civil decisions to situations such as the one now before it." Id. at 213 n.14. See also United States v. Liddy, 478 F.2d 586 (D.C.Cir.1972) (affirming District Court) (Leventhal, J., dissenting) (advocating adoption of a balancing approach in the criminal context)
 
 
 [45]
 See Baker v. F & F Investment, supra note 40, 470 F.2d at 783 (cases in which First Amendment rights must yield are "few in number"; interest sufficiently compelling to override privilege will be "rare")
 
 
 [46]
 As one commentator has argued:
 Unless reporters and informers can predict with some certainty the likelihood that newsmen will be required to disclose news or information obtained in confidential relationships, there is a substantial possibility that many reporters and informers will be reluctant to engage in such relationships. As a result of this deterrence, the flow of information to the public will be diminished regardless of whether disclosure could have actually been compelled. * * *
 Note, supra note 40, 80 Yale L.J. at 336 (footnote omitted). It might be argued that the deterrence problem demonstrates a need for specificity, and that the case-by-case balancing approach we have adopted is inconsistent with this need for specificity. See Branzburg v. Hayes, supra note 39, 408 U.S. at 702 n.39, 92 S.Ct. at 2667 (criticizing ad hoc approach on ground that absence of clearly delineated situations in which privilege applies would undermine its effectiveness). But in our view the deterrence effect can also be avoided so long as the privilege is overridden only in rare circumstances.
 
 
 [47]
 The importance of the information sought was first emphasized in Garland v. Torre, supra note 43. In that case Judy Garland sued for libel, alleging that newspaper articles contained defamatory statements. The author of the newspaper articles refused to reveal her sources. The District Court sentenced the journalist to jail for criminal contempt. The Second Circuit affirmed this decision, in part because the identity of the source "went to the heart of the plaintiff's claim." 259 F.2d at 550
 
 
 [48]
 We stated that the identity of the source was important, because proof that the reporter had not used reliable sources bore heavily on the question whether he acted with "actual malice." Carey v. Hume, supra note 40, 492 F.2d at 637. Under New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), of course, plaintiffs who are public figures must show that the press acted with "actual malice" before they can prevail in libel actions
 
 
 [49]
 In Baker v. F & F Investment, supra note 40, the plaintiffs sued real estate agents under the Civil Rights Act, charging that the agents had discriminated in the sale of houses in the Chicago area. They sought an order compelling disclosure of a journalist's sources for a story, published several years before the action commenced, in which the racially discriminatory practices of real estate speculators and landlords were exposed. This order was denied by the District Court, and the Second Circuit upheld the District Court's decision, relying heavily on the fact that the plaintiffs had failed to show that the identity of the confidential source was critical to the success of their claim. The court also emphasized the plaintiffs' failure to exhaust alternative sources of information. For a further discussion of Baker, see note 50 infra. See also Cervantes v. Time, Inc., 464 F.2d 986 (8th Cir. 1972) (upholding claim of privilege in libel action because information sought was of little relevance); Riley v. City of Chester, supra note 40 (stressing importance of relevance of information sought); Silkwood v. Kerr-McGee Corp., 563 F.2d 433 (10th Cir. 1977) (same)
 
 
 [50]
 We noted with approval the decision in Baker v. F & F Investment, supra note 40, where some 60 real estate defendants were charged with discriminatory practices, and the informant who provided information to a journalist was also a real estate agency. We stated that "the court obviously saw no reason why the defendants themselves could not be deposed for the same information." Carey v. Hume, supra, note 40, 492 F.2d at 639. In Carey we also noted with approval the decision in Garland v. Torre, supra note 43, where the plaintiff, before asking a journalist to reveal her sources, deposed three other individuals who might have had access to the information sought
 
 
 [51]
 See also Riley v. City of Chester, supra note 40, 612 F.2d at 716 (distinguishing libel case); Baker v. F & F Investment, supra note 40, 470 F.2d at 783-784 (same); Cervantes v. Time, Inc., supra note 49 (upholding claim of privilege in libel action because information sought was of little relevance). Cf. Anderson v. Nixon, 444 F.Supp. 1195 (D.D.C.1978) (refusing to uphold privilege where reporter was plaintiff). See generally Note, supra note 40, 80 Yale L.J. at 339, 360-363 (arguing that although in general the privilege should be broad, an exception should be made where the reporter is a defendant in libel action covered by the rule of New York Times Co. v. Sullivan, supra note 48
 
 
 [52]
 We do not decide whether compelled disclosure would have been appropriate if appellants had fulfilled their obligation to exhaust alternative sources
 
 
 [53]
 In Carey v. Hume, supra note 40, 492 F.2d at 639, we suggested that as many as 60 depositions might be a reasonable alternative. See note 50 supra
 
 
 [54]
 Appellants might also have deposed the court personnel who would have had access to the tapes during the 1971 criminal trial, the reporter who wrote the Los Angeles Times article describing the tapes, and the participants in the 1976 Anthony Giacalone criminal trial to whom the existence of the tapes was revealed. See note 11 supra. Since the record does not reveal how many names were on the list of employees with access to the tapes provided by the Government during the 1971 criminal trial, see text accompanying note 25 supra, we cannot now determine whether appellants would have been required to depose every one of those individuals. Depending on the contents of that list, however, some depositions might have been appropriate
 
 
 [55]
 Appellants suggest this gamesmanship does suffice, citing Democratic Nat'l Committee v. McCord, 356 F.Supp. 1394 (D.D.C.1973), Baker v. F & F Investment, supra note 40, and Carey v. Hume, supra note 40. We find no support for their argument in those cases
 
 
 [56]
 Appellants' statement, see text following note 25 supra, can be interpreted in two ways. They may have merely intended to accept the representation that the Justice Department investigation failed to uncover any evidence that Justice Department employees released the logs
 
 
 [57]
 Rule 56(e), Fed.R.Civ.P., provides in relevant part:
 When a motion for summary judgment is made * * * an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.
 Thus "mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment * * *." Liberty Leasing Co. v. Hillsum Sales Corp., 380 F.2d 1013, 1015 (5th Cir. 1967).
 
 
 [58]
 Compare Appellants' Affidavits, JA 1 at 10, 12; Attorneys' Affidavits, R. 1 Doc. 55, with Original Complaint, JA 1 at 7-9
 
 
 [59]
 See notes 6 and 54 supra
 
 
 [60]
 Rule 56(f), Fed.R.Civ.P., provides:
 Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
 
 
 [61]
 Several days after filing their opposition to the Government motion for summary judgment, appellants did file a supplemental memorandum in which they contended that disclosure by the Government in a Freedom of Information Act suit brought by Zerilli (Zerilli v. Smith, No. 79-2480, consolidated with this case and discussed in Part II infra ) necessitated further discovery. See Supplemental Memorandum in Opposition to Government's Motion for Summary Judgment, R. 1 Doc. 55. But even if we treat this document as an acceptable substitute for the affidavit required by Rule 56(f), we do not believe that further discovery was warranted. The disclosure referred to by appellants was the Government's statement that the logs had "been furnished on numerous occasions from 1967 to 1975 to various Department of Justice officials and to FBI Headquarters." Id. But appellants already knew that Justice Department employees had been given access to the logs. It is not clear why release of this information would have come as a surprise to appellants, so that further discovery was needed. It is instructive to compare Kung v. Fom Investment Corp., 563 F.2d 1316 (9th Cir. 1977). There also a party opposing a motion for summary judgment requested an opportunity for further discovery. Even though the party supplied the affidavit required by Rule 56(f), the court refused its request since there had been ample prior opportunity to take discovery
 
 
 [62]
 See appellees' brief at 11
 
 
 [63]
 See Record in No. 79-2480 (R. 2) Doc. 18, Attachment B-Exhibit M
 
 
 [64]
 Complaint, reprinted in Joint Appendix to No. 79-2480 (JA 2) at 5-6
 
 
 [65]
 The FBI released documents in 1977, 1978, and 1979. See R. 2 Doc. 18, Attachment C-Exhibits H, J, and K
 
 
 [66]
 See Defendant's Motion for Summary Judgment, R. 2 Doc. 18
 
 
 [67]
 See R. 2 Docs. 19-21
 
 
 [68]
 See Opposition to Motion for Summary Judgment, R. 2 Doc. 22
 
 
 [69]
 Local Rule 1-9(d), Rules of the United States District Court for the District of Columbia, provides:
 (d) OPPOSING POINTS
 AND AUTHORITIES
 Within ten days of the date of service or such other time as the court may direct, an opposing party shall serve and file a statement of points and authorities in opposition to the motion, together with a proposed order. If such opposing statement is not filed within the prescribed time, the court may treat the motion as conceded.
 
 
 [70]
 See Motion for Extension of Time Until October 15, 1979, to Respond to the Motion for Summary Judgment, R. 2 Doc. 23
 
 
 [71]
 According to the Docket Sheet, reprinted in JA 2 at 2-4, no memorandum was ever filed
 
 
 [72]
 See Order, filed October 26, 1979, reprinted in JA 2 at 10
 
 
 [73]
 See note 69 supra
 
 
 [74]
 See Motion for Summary Judgment, R. 2 Doc. 18. Zerilli claims on appeal that the Government's indices and affidavits were insufficient to permit the District Court to rule on the claims of exemption under the Freedom of Information Act, 5 U.S.C. § 552 (1976). Since we have affirmed the District Court's decision to treat the Government's motion as conceded under Local Rule 1-9(d), we need not reach this issue. We note, in any event, that because appellant failed to file a statement of genuine issues he has waived any claim that there are genuine disputes as to material facts. Local Rule 1-9(h), Rules of the United States District Court for the District of Columbia, provides that if an opposing party fails to file a statement of genuine issues, "the court may assume that the facts as claimed by the moving party in his statement of material facts are admitted * * *." Additionally, we note that the Vaughn v. Rosen indices are very thorough, totalling hundreds of pages. In response to the Government's detailed showing, appellant has stated only that the indices are conclusory. He has not raised any specific objections. Because he failed to point to any specific defects in the indices, we think it unlikely that he would have prevailed
 
 
 [75]
 See Opposition to Motion for Summary Judgment, R. 2 Doc. 22
 
 
 [76]
 See note 71 supra