520 So.2d 372 (1988)
In re GRAND JURY PROCEEDINGS (Ronald RIDENHOUR, Petitioner).
No. 87-KK-2383.
Supreme Court of Louisiana.
February 29, 1988.
John Reed, Lori Fregolle, Glass & Reed, New Orleans, for applicant.
Harry F. Connick, Dist. Atty., Kevin Boshea, New Orleans, for respondent.
Mary Louise Strong, Jack M. Weiss, Mary Ellen Roy, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, amicus curiae for The Louisiana Press Assn.
*373 MARCUS, Justice.
Mr. Ronald Ridenhour is a reporter for City Business, a bi-weekly newspaper. Beginning on February 16, 1987, City Business ran a series of articles, written by Ridenhour, that detailed a long history of lax enforcement and collection of sales taxes by the New Orleans Department of Finance. The articles charged that city revenue officials were allowing delinquent taxes from six large businesses to go uncollected. Although Ridenhour based this allegation on both unidentified and identified sources, he specifically disclaimed any knowledge of financial corruption.[1] He also alleged that city officials were not interested in correcting the problems and had, in fact, responded with threats of discharge or criminal prosecution to the presumed sources of the story.[2] After a second article suggested that the city administration intended to "cover up" and allow the problems to go unresolved, the New Orleans City Counsel employed an independent counsel to investigate the Department of Revenue and Taxation, and the Orleans Parish District Attorney convened a special grand jury to investigate the matter.
Initially, the special grand jury investigation did not lead to any indictments.[3] When the investigation failed to lead to any indictments, Ridenhour wrote more articles sharply criticizing the district attorney and the entire investigation.[4] Ridenhour also alleged that four of the members of the special grand jury were connected with either the city administration or the officials of the Department of Revenue and Taxation.
Three weeks after the September 28th article criticizing the district attorney and the grand jury was published, Ridenhour was served a subpoena to appear before the grand jury. Responding to the subpoena, Ridenhour appeared before the grand jury on October 21, 1987 and was asked the following questions by the assistant district attorney:
Q.1. In regard to those articles, you have used certain sources of information. I would like to ask what those sources of information are, if you would share that with this Grand Jury?
Q.2. Do you have knowledge and evidence of criminal wrongdoing by anyone in the Department of Finance in the City of New Orleans?
Q.3. Do you have any knowledge of anyone employed by the Department of Finance, or any evidence of a person employed by the Department of Finance accepting anything of value to give preferential treatment to any taxpayer?
Q.4. Mr. Ridenhour, do you have any knowledge or evidence of any taxpayer offering anything of value to any Department of Finance employee in an attempt to get preferential treatment in regard to the payment, or the amount of any tax penalty or interest?

*374 Q.5. Mr. Ridenhour, did you view or examine any documents or gain knowledge or information in any other manner which is evidence of a crime by any employee of the Department of Finance in regard to any employee's job duties?
Ridenhour refused to answer each of the questions and asserted his privilege as a news gatherer. He stated that the information sought was protected by the first amendment of the federal constitution, the state constitution, and the state statutory privilege for reporters.[5] After Ridenhour refused to answer the first two questions, the parties went before the trial judge and argued their respective positions. The trial judge ruled that Ridenhour did not have to answer the first question regarding his sources or any other question that would directly or indirectly reveal the nature of a source. He would, however, have to answer any other question unless it could be shown "that the purpose of this Grand Jury subpoena is not for law enforcement but rather to harass or disrupt the reporter's relationship with his news sources."[6] The parties then returned to the grand jury room.
After Ridenhour refused to answer the last three questions, the parties again went before the trial judge. The trial judge ruled that Ridenhour had to answer the questions. Ridenhour then obtained permission to apply for writs. The court of appeal denied his application. On Ridenhour's application to this court, we granted certiorari to review the correctness of the trial judge's ruling.[7]
The state statutory privilege for reporters (La.R.S. 45:1452) provides:
Except as hereinafter provided, no reporter shall be compelled to disclose in any administrative, judicial or legislative proceedings or anywhere else the identity of any informant or any source of information obtained by him from another person while acting as a reporter.
This section has been interpreted by this court to protect not only the identity of the sources, but also any information that would indirectly tend to identify the source such as place of employment. In re Michael Burns, 484 So.2d 658 (La.1986). This privilege is not irrevocable. The person seeking the information may apply for an order revoking the privilege and the order will be granted if the court finds, after a hearing, that the "disclosure is essential to the protection of the public interest."[8]
Therefore, absent a showing that the identity of the sources is essential to the protection of the public interest, the trial judge was correct in ruling that Ridenhour did not have to answer the first question about sources or any other question that would directly or indirectly reveal the nature of a source. It does not appear, however, that any of the last four questions would fall into this latter category. Therefore, the information sought in the last four questions is not protected by the statutory privilege.
The issue before this court, therefore, is whether the information sought in the last four questions is protected by the first amendment of the federal constitution[9] and the state constitution.[10] The United States Supreme Court dealt with the issue of whether a reporter can refuse to answer questions in front of a grand jury based on the first amendment in Branzburg v. *375 Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed. 2d 626 (1972).[11] Branzburg had written two articles in which he described his observations of several people smoking marijuana and two individuals synthesizing hashish from marijuana. Pappas did not write an article but was summoned to appear before a grand jury and answer questions about what he had observed during a three-hour stay inside Black Panther headquarters. The third reporter, Caldwell, was subpoenaed to appear and to bring with him notes and tape recordings of interviews with officers of the Black Panther Party. Caldwell had written an article and had quoted the Chief of Staff of the Party as saying: "We advocate the very direct overthrow of the Government by way of force and violence."
In a plurality opinion, the Court held that the reporters had to appear and answer the questions before the grand juries. Nevertheless, Justice White, joined by three other justices in his plurality opinion, wrote:
[N]ews gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment. Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification.
Branzburg 408 U.S. at 708, 92 S.Ct. at 2670. Therefore, even the plurality acknowledged that a reporter has some first amendment protection. Justices Stewart, Brennan and Marshall dissented. They would not have made the reporters answer the questions and would have held that reporters have a qualified privilege. This privilege can only be overcome if the government (1) shows that there is probable cause to believe that the newsman has information that is clearly relevant to a specific probable violation of law; (2) demonstrates that the information cannot be obtained by alternative means less destructive of first amendment rights; and (3) demonstrates a compelling and overriding interest in the information. Branzburg, 408 U.S. at 744, 92 S.Ct. at 2681 (dissenting opinion). Justice Douglas dissented because he would have held that there is an absolute privilege for reporters. Branzburg, 408 U.S. at 712, 92 S.Ct. at 2686 (dissenting opinion). Finally, Justice Powell stressed in his concurring opinion the "limited nature of the Court's holding." Branzburg, 408 U.S. at 709, 92 S.Ct. at 2671 (concurring opinion). While Justice Powell did not adopt the dissent's three-part showing to revoke the privilege, he did adopt a case-by-case balancing test. Justice Powell stated:
The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.
Branzburg 408 U.S. at 710, 92 S.Ct. at 2671 (concurring opinion).
The vast majority of the courts that have considered this issue after Branzburg have read Branzburg as merely holding that reporters who witness a crime may be compelled to testify before a grand jury as to whom and what they saw. These courts have proceeded to adopt the dissent's qualified privilege.[12]
*376 Our reading of Branzburg leads us to hold that unless the reporter has witnessed criminal activity or has physical evidence of a crime, he may move to quash the subpoena or he may appear and refuse to answer certain questions. At that point, the party seeking the information must show that the disclosure is necessary to the protection of the public interest.[13] Once the showing has been made that the disclosure is necessary to the public interest, the trial judge should balance the public interest in having all relevant testimony with the possible "chilling effect" the disclosure will have on the freedom of the press and the ability to gather news. Consideration should be given to insure that the party seeking the information is not on a mere fishing expedition and is not "attempting to annex the journalistic profession as an investigative arm of the government." Branzburg 408 U.S. at 710, 92 S.Ct. at 2671 (dissenting opinion). Consideration should also be given to the idea that the press' most important function is to question and investigate the government.[14] Therefore, additional weight should be given to the reporter's interest when the information concerns his investigation of or criticism of the government. The party seeking the information must also show that the subpoena was issued in good faith and not for purposes of harassment particularly when, as in this case, the articles investigated alleged government inadequacies and criticized the district attorney as well as several members of the grand jury.
Accordingly, we hold that unless a reporter has witnessed any criminal activity or has physical evidence of a crime, he may move to quash the subpoena or he may appear and refuse to answer certain questions. The party seeking the protected information must show (1) that the disclosure is necessary to the public interest and (2) that the subpoena was issued in good faith and not for purposes of harassment. Before the reporter can be required to answer questions that would force him to reveal confidential information, the trial judge must find that the public interest in disclosure outweighs the constitutional guarantee of freedom of the press.

DECREE
For the reasons assigned, the ruling of the trial judge is vacated and the case is remanded to the district court with instructions to the trial judge to conduct a hearing in accordance with the views expressed herein.
DENNIS, J., concurs with reasons.
DENNIS, Justice, concurring.
I respectfully concur in the majority opinion's holding that:
The party seeking the protected information must show (1) that the disclosure is necessary to the public interest and (2) that the subpoena was issued in good faith and not for purposes of harassment. Before the reporter can be required to answer questions that would force him to reveal confidential information, the trial judge must find that the public interest in disclosure outweighs the constitutional guarantee of freedom of the press.
However, in order to give definite content to the terms "public interest" and "good faith", and certainly as a matter of state constitutional law, I would hold that the state must (1) show that there is probable cause to believe that the newsman has information that is clearly relevant to a specific probable violation of law; (2) demonstrate that the information sought cannot be obtained by alternative means less destructive of First Amendment and state constitutional rights; and (3) demonstrate a compelling and overriding interest in the *377 information. Branzburg v. Hayes, 408 U.S. 665, 743-45, 92 S.Ct. 2646, 2681-82, 33 L.Ed.2d 626, 676-78 (1972) (Stewart, J., dissenting); see United States v. Burke, 700 F.2d 70, 76-77 (2nd Cir.1983); United States v. Cuthbertson, 630 F.2d 139, 146-49 (3rd Cir.1980); Larouche v. N.B.C., Inc., 780 F.2d 1134, 1139 (4th Cir.1986); Miller v. Transamerican Press, Inc., 621 F.2d 721, 725-26 (5th Cir.1980); Silkwood v. Kerr-McGee Corp., 563 F.2d 433, 438 (10th Cir.1977); United States v. Caporale, 806 F.2d 1487, 1504 (11th Cir.1986); Zerrilli v. Smith, 656 F.2d 705, 710-15 (D.C.Cir.1981).
NOTES
[1] Since Ridenhour had no knowledge or evidence of corruption, he questioned whether the level of incompentence might have risen to a level of criminal malfeasance. In his February 16, 1987 article, he questioned:

What's it all about? Political favors? The exchange of brown envelopes in dark places?
Hard to say for sure. No City Business source claims to have proof or even know about any inducements that anyone in the Bureau of Revenue or the Department of Finance might be receiving or might have received, other than some murky claims that Joan Buttigig (the collector of revenue) was overheard on several occasions last Christmas telling people to send gifts to her home instead of the office.
How could things have gotten this bad? Pure managerial incompetence, some say. Deliberate criminal incompetence, say some others.
[2] A supervisor in the New Orleans Department of Finance was fired the first week of January 1988. The supervisor alleges that she was fired in retaliation for her participation in the investigation.
[3] Since December 1987, the grand jury has indicted the owners of four businesses on charges that they failed to pay state and city sales taxes and failed to file sales tax returns. A newspaper report indicates that the district attorney's investigation has been "abandoned unless someone produces new evidence."
[4] In his article on September 28, 1987, Ridenhour referred to the district attorney's staff as "the three blind mice," stated that the "investigation stinks" and charged that the district attorney's "actions reek of secret deals and cover up at almost every level."
[5] La.R.S. 45:1452.
[6] This is how the trial judge interpreted Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).
[7] In re Grand Jury Proceedings (Ronald Ridenhour), 514 So.2d 1167 (La.1987).
[8] La.R.S. 45:1453.
[9] The first amendment of the federal constitution provides in pertinent part:

Congress shall make no law ... abridging the freedom of speech, or of the press....
This amendment is made applicable to the states by the fourteenth amendment.
[10] Article 1, § 7 of our state constitution provides in pertinent part:

No law shall curtail or restrain the freedom of speech or of the press.
For purposes of this issue, we will consider the two constitutions together. The information is either protected by both or not protected by either.
[11] Branzburg was consolidated with two other cases: In the Matter of Pappas and United States v. Caldwell.
[12] Nine of the eleven United States courts of appeal that have considered the issue have held that there is a qualified privilege. Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 224 Ct.Cl. 583 (1st Cir.1980); United States v. Burke, 700 F.2d 70 (2nd Cir.1983); United States v. Cuthbertson, 630 F.2d 139 (3rd Cir. 1980); Larouche v. NBC, Inc., 780 F.2d 1134 (4th Cir.1986); Miller v. Transamerican Press, Inc., 621 F.2d 721 (5th Cir.1980); Cervantes v. Time, Inc., 464 F.2d 986 (8th Cir.1972); Silkwood v. Kerr-McGee Corp., 563 F.2d 433 (10th Cir.1977); United States v. Caporale, 806 F.2d 1487 (11th Cir.1986); Zerilli v. Smith, 656 F.2d 705 (D.C. Cir.1981).

Our research also reveals that 24 of the 34 states that have considered the issue have also recognized a qualified privilege.
[13] This showing is similar to but not as high as the showing required to revoke the statutory privilege (disclosure of sources) which is that "disclosure is essential to the protection of the public interest." La.R.S. 45:1453. The showing for the disclosure of information is not as high as for sources because it is more important to protect sources. The disclosure of sources has a greater "chilling effect" on a reporter's news gathering ability.
[14] This theory is known as the "Fourth Estate" role of the press and has been advanced by Justice Stewart.