Jane Potter ANDREWS, Plaintiff,

v.

ELI LILLY & CO., INC., et al., Defendants.

Tracey Ann TAYLOR, Plaintiff,

v.

E.R. SQUIBB & SONS, INC., et al., Defendants.

Paula RENFROE, et al., Plaintiffs,

v.

ELI LILLY & COMPANY, et al., Defendants.

Nancy DEITCHMAN, Plaintiff,

v.

REXALL DRUG COMPANY, et al., Defendants.

Nos. 82 C 7316, 82 C 7588, 83 C 1247 and 83 C 1248.

United States District Court, N.D. Illinois, E.D.

March 23, 1983.

George J. Cotsirilos, Robert M. Stephenson, Cotsirilos & Crowley, Ltd., Chicago, Ill., for Dr. Herbst.

Roxanne M. Wilson, Haight, Dickson, Brown & Bonesteel, Santa Monica, Cal., Richard Favoriti, Steven M. Kowal, Burditt & Calkins, Chicago, Ill., for Squibb.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

This case is before the court on the motion of Dr. Arthur Herbst to quash a deposition subpoena directed to him which calls for the production of various research materials in his custody.[1]

---

1. This is not the first time Dr. Herbst has been before us. We denied his motion to quash in Bohlken v. Abbott Laboratories, No. 81 C 5554 (N.D.Ill. Jan. 26, 1982). However, there the

The deposition subpoena was served on Dr. Herbst by E.R. Squibb & Sons, Inc. ("Squibb"), pursuant to Fed.R.Civ.P. 45. Squibb has been sued by Paul Renfroe and Nancy Deitchman ("plaintiffs") in two separate cases brought in the United States District Court for the Eastern District of Missouri, Eastern Division. In these cases, plaintiffs allege that their mothers took a drug manufactured by Squibb called diethylstilbestrol (DES) while they were pregnant with plaintiffs, and that this caused plaintiffs to contract adenocarcinoma of the vagina some years later.[2]

Dr. Herbst did not treat plaintiffs or their mothers at any time. His involvement in the case stems from a study he began in 1969 while teaching at the Harvard Medical School which examined the incidence of adenocarcinoma of the vagina in young women. The study suggested an association between the ingestion of DES by pregnant women and the later development of adenocarcinoma of the vagina in their female offspring. Dr. Herbst and his colleagues published their findings in 1971.[3] Based on this study and another,[4] the Food and Drug Administration banned the use of DES for pregnant women in 1971.

Dr. Herbst's 1971 study has been frequently used by plaintiffs in products liability cases such as these who seek to establish the connection between DES and adenocarcinoma. All parties agree that the study is of enormous significance to this field of medicine, and it is likely that Squibb will be confronted with it in one form or another[5] at trial on the merits. Dr. Herbst himself will not testify at trial, however. To the contrary, he has steadfastly refused to become personally involved in DES litigation.

In 1972, Dr. Herbst established what is now known as the Registry for Hormonal Transplacental Carcinogensis at the University of Chicago, where he is presently Chairman of the department of obstetrics and gynecology. The Registry is the only centralized repository of data on adenocarcinoma of the genital tract. To begin the Registry, Dr. Herbst sent letters to all departments of obstetrics of medical schools in the United States, hospitals throughout the world and the World Health Organization, requesting records of all women who had been born after 1940 and contracted clear cell adenocarcinoma of the genital tract. Dr. Herbst also placed announcements in major medical journals. In all his solicitations, Dr. Herbst promised that all information received by the Registry would be kept confidential. Upon receiving records for a particular case, Dr. Herbst would contact the patient and her mother's obstetrician, to obtain additional records and information about the mother's possible use of DES.

The initial goals of the Registry included determining the incidence of the disease, the best means of treatment, the relationship between the disease and DES, and other factors which promote the disease. Presently, the Registry contains over 500 cases. Dr. Herbst requests updated information from each patient's treating physician annually. The findings of the Registry have been published in over one dozen articles by Dr. Herbst and others. All agree that the Registry is truly unique; there is no other repository of data like it. New cases are continually being reported to the Registry, and it continues to monitor older ones to learn more about the disease and its

---

subpoena was much narrower, and Dr. Herbst's position much different, than is the case here.

2. These cases were assigned to us as related to *Taylor v. E.R. Squibb & Sons, Inc.,* No. 82 C 7588 and *Andrews v. Eli Lilly & Co.,* No. 82 C 7316, where Dr. Herbst had also moved to quash. The underlying actions in these cases have since been settled, mooting the subpoenas there.

3. Herbst, Ulfelder & Poskanzer, *Adenocarcinoma of the Vagina—Association of Maternal Stilbestrol Therapy with Tumor Appearance in Young Women,* 284 New Eng.J.Med. 878 (1971).

4. Greenwald, Barlow & Nasca, *Vaginal Cancer after Maternal Treatment with Synthetic Estrogens,* 285 New Eng.J.Med. 390 (1971).

5. Generally, the study is cited by expert witnesses in support of their conclusion that DES causes adenocarcinoma.

treatment. DES-associated cases of clear cell adenocarcinoma are expected to continue to appear until well into the 1990's. Thus, continued monitoring through the Registry will be vital in order to learn more about the disease and how to treat it.

The subpoena served on Dr. Herbst calls for the production of records and testimony relating to every person in the Registry who has clear cell adenocarcinoma of the genital tract and every person with a history of exposure to DES or other synthetic estrogens.[6] Dr. Herbst states, without contradiction from Squibb, that the subpoena, in substance, calls for the production of every record in the Registry.

■ Dr. Herbst has moved to quash the subpoena as unreasonable and oppressive. The starting point for our analysis of his claim is Fed.R.Civ.P. 26(b)(1), which states that parties may obtain discovery of any matter, not privileged, that is relevant to the subject matter involved in the pending action. Dr. Herbst concedes that the subpoena seeks material that is properly discoverable under rule 26(b)(1). However, that rule is limited by *id.* 26(c), which permits a court, for good reason shown, to refuse discovery requests that are oppressive or create an undue burden.[7] In determining whether Dr. Herbst has met his burden under the rule to show unreasonableness or oppression, we must balance the hardship imposed on Squibb by quashing the subpoena against the hardship imposed on Dr. Herbst by permitting the discovery

Squibb seeks. *See Marresse v. American Academy of Orthopaedic Surgeons,* 692 F.2d 1083, 1088 (7th Cir.1982); *Dow Chemical Co. v. Allen,* 672 F.2d 1262, 1269–70 (7th Cir.1982); *In re Multi-Piece Rim Products Liability Litigation,* 653 F.2d 671, 679 (D.C. Cir.1981); *Pollitt v. Mobay Chemical Corp.,* 95 F.R.D. 101, 105 (S.D.Ohio 1982); *Robinson v. MaGovern,* 83 F.R.D. 79 (W.D.Pa. 1979); *Richards of Rockford, Inc. v. Pacific Gas & Electric Co.,* 71 F.R.D. 388, 389 (N.D. Cal.1976); *Apicella v. McNeil Laboratories, Inc.,* 66 F.R.D. 78, 82 (E.D.N.Y.1975).[8]

We turn first to the hardship imposed on Squibb, which it argues should be measured by its need for the requested material in order to defend itself at trial on the merits. Squibb points out that Dr. Herbst's published findings regarding the relationship between DES and Adenocarcinoma are often cited by plaintiffs, and will probably be cited by plaintiffs' expert witnesses at their impending trials. Squibb contends that it must obtain access to the data underlying those findings, so that it can critically scrutinize the findings and meaningfully cross-examine plaintiffs' witnesses.

It is certainly true that Squibb is entitled to cross-examine plaintiffs' witnesses on the data underlying their opinions regarding DES. *See* Fed.R.Evid. 703, 705. It is also true that access to that data is required in order to make cross-examination meaningful. *See Wright v. Jeep Corp.,* 547 F.Supp. 871, 874 (E.D.Mich.1982). However, in the

---

**6.** The subpoena also requires production of all records and testimony relating to investigative techniques used by the Registry including questionnaires used to solicit information from sources, protocols of the Registry and statistical and computer analyses of information in the Registry. Finally, the subpoena also calls for all articles, studies, reports and drafts thereof prepared in whole or part by reference to data in the Registry. Squibb has not explained why it waited until so close to the date of trial on the merits to serve the subpoena.

**7.** Dr. Herbst styles his motion to quash as one under Fed.R.Civ.P. 45(b)(1), which permits a subpoena for the production of tangible evidence to be quashed if unreasonable or oppressive. But rule 45(b) does not entirely apply to this subpoena since it also calls for testimony.

For that portion of the subpoena, rule 26(c) must be used. However, it appears that the test for unreasonableness or oppression is the same for both rules. *See Los Angeles Mem. Coliseum Comm'n v. National Football League,* 89 F.R.D. 489, 496 (C.D.Cal.1981); *Sigler v. Mutual Benefit Life Ins. Co.,* 506 F.Supp. 542, 549 (S.D.Iowa 1981); Fed.R.Civ.P. 45(b) Advisory Committee's Note; 5A J. Moore & J. Lucas, Moore's Federal Practice ¶ 45.05[2] (1982).

**8.** Squibb asserts that it is willing to pay Dr. Herbst's expenses associated with the subpoena, and thereby minimize the burden it creates. However, as will become apparent, that argument misconceives the nature of the burden Dr. Herbst contends that the subpoena creates for him. Dr. Herbst's principal worries about the subpoena are not financial.

peculiar facts of this case, we doubt that Squibb's need for the requested material is truly compelling.

First, the findings of Dr. Herbst that are generally cited by plaintiffs such as these are those contained in his original 1971 article.[9] However, the Registry was not founded until after that, and therefore the data it contains does not underlie the material with which Squibb is likely to be confronted at trial. The data in the Registry may tend to either corroborate or contradict that study, but it is not data relied upon, and hence admissible under Fed.R.Evid. 703 and 705, when an expert cites the 1971 article. Since Squibb will not likely be directly or indirectly confronted with data from the Registry at trial, its need for access to that data through discovery is less. *See Dow Chemical Co. v. Allen,* 672 F.2d 1262, 1273 (7th Cir.1982).

Second, Dr. Herbst will not be a witness at trial on the merits. That factor tends to reduce Squibb's need for the data. *See Buchanan v. American Motors Corp.,* 697 F.2d 151 (6th Cir.1983); *Dow,* 672 F.2d at 1277; *Zerilli v. Smith,* 656 F.2d 705, 714 (D.C.Cir.1981); *Dart Industries Co. v. Westwood Chemical Co.,* 649 F.2d 646, 649 (9th Cir.1980); *Tavoulareas v. Piro,* 93 F.R.D. 35, 41–42 (D.D.C.1981); *Anderson v. Nixon,* 444 F.Supp. 1195, 1199–1200 (D.D.C.1978).

Third, and most important, Squibb has made no showing as to what it hopes to prove by obtaining access to the data in the Registry. Apparently it seeks to question the relationship between DES and adenocarcinoma. However, the parties appear to agree that every study that has been done, both by Dr. Herbst and others, has corroborated the findings contained in the original 1971 article.[10] Squibb does not, for example, submit any affidavits from persons with relevant expertise stating that there may be reason to question Dr. Herbst's findings. Dr. Herbst's work has been submitted to the scrutiny of the medical profession for over a decade now, and nothing in the record indicates other than that his conclusions have been fully corroborated. All Squibb can do is speculate that the Registry contains material that will undermine those conclusions.[11] Squibb's asserted "need" for this material is based, on the present record, on nothing more than a speculative hope that it will find something that undermines the widely-accepted conclusions of the medical profession about DES. Such speculation does not make for a strong claim of need.[12]

We now turn to the burdens imposed on Dr. Herbst if he must comply with the subpoena. They fall into two categories.[13]

---

**9.** The only affidavit Squibb has submitted in support of its position is that of its counsel. Counsel states that she believes Squibb will be confronted with expert testimony based on Dr. Herbst's research at trial on the merits, and cites recent DES cases where this has occurred. However, both the specific examples she uses involve experts who cited the 1971 article to support their conclusions, and not any later study based on Registry data. *See* Affidavit of Roxanne M. Wilson ¶ 5.

**10.** For example, an independent 1971 study, cited in note 4, *supra,* corroborated Dr. Herbst's findings. The Food and Drug Administration's subsequent ban on the use of DES in pregnant women also corroborates Dr. Herbst; presumably the FDA examined Dr. Herbst's data critically before making its decision. Such an examination would be required under 5 U.S.C. § 706 and 21 U.S.C. §§ 360f–g (1976). *See, e.g., Hess & Clark, Division of Rhodio, Inc. v. FDA,* 495 F.2d 975 (D.C.Cir.1974); *Bell v. Goddard,* 366 F.2d 177 (7th Cir.1966).

**11.** Moreover, to undermine Dr. Herbst's published findings, Squibb must, it appears, demonstrate that Dr. Herbst materially misrepresented the data in the Registry in his writings. We will not readily engage in such speculation about a man of Dr. Herbst's stature in his profession.

**12.** To put it in mathematical terms, need can be understood as a function of the probative value of the evidence Squibb hopes to discover multiplied by the likelihood that it will be discovered as a result of the instant subpoena. Since Dr. Herbst's findings appear to have been amply corroborated, we think the likelihood that Squibb will find what it hopes to discover, and hence its need, is low.

**13.** Dr. Herbst asks us to hold that it would be a violation of his first amendment right to receive information for us to enforce the subpoena. We need not go so far, however. Dr. Herbst's claim of a first amendment privilege is properly understood as an assertion of a burden or hard-

The first involves the need for confidentiality of the data in the Registry.[14] All the material in the Registry has been obtained from patients and doctors pursuant to Dr. Herbst's promise that it would remain confidential. Dr. Herbst has refused to testify or become involved in DES litigation precisely to preserve this confidentiality. In his affidavit, Dr. Herbst states that doctors will not provide the Registry with records absent a promise of confidentiality in order to avoid the risks of having their records disclosed, and that patients will not provide their records absent such a promise in order to avoid a breach of their privacy. Affidavit of Arthur L. Herbst ¶¶ 23–24. He goes on to state that if he must comply with the subpoena, the Registry would literally be destroyed since the information it contains would no longer be confidential and therefore its sources would dry up. *Id.* ¶¶ 25–27. Dr. Herbst's contentions are fully supported by the affidavits of a number of other eminent figures in the field of epidemiology.[15] Moreover, it appears that Squibb's subpoena threatens more than just the Registry. Dr. William M. Haenszel of the University of Illinois School of Public Health, after stating the need to preserve confidentiality if the Registry is to survive, goes on to observe,

> The adverse impact of forced disclosures would not be limited to any single study.

The threat of possible extension to other studies would suffice to modify the general behavior of physicians and patients with respect to collaboration in a broad range of studies. The end result to be feared is a very substantial reduction in the quality and quantity of epidemiological research and the loss of information that contributes to advancement in the standards of medical care for our population.

Affidavit of William M. Haenszal ¶ 4. *See also* Affidavit of Leon Gordis ¶ 14. In addition, Dr. Herbst has submitted the affidavits of physicians who have contributed to the Registry and who state that they would not do so in the future if Squibb's subpoena is enforced.[16]

■ Courts have recognized that confidentiality is often essential to the ability of researchers to obtain data. *See Richards of Rockford, Inc. v. Pacific Gas & Electric Co.,* 71 F.R.D. 388, 390 (N.D.Cal.1976); *see also Lampshire v. Proctor & Gamble Co.,* 94 F.R.D. 58 (N.D.Ga.1982).[17] The federal government has also recognized this by requiring medical researchers who receive federal grants, such as Dr. Herbst, to maintain the privacy of human subjects and confidentiality of data. *See* 45 C.F.R. § 46.111(a)(7) (1981).[18] The state of Illinois

ship that must be weighed against Squibb's need for the discovery. *See Marrese v. American Academy of Orthopaedic Surgeons,* 692 F.2d 1083, 1088 (7th Cir.1982); *Hastings v. North East Indep. School Dist.,* 615 F.2d 628 (5th Cir.1980); *Tavoulareas v. Piro,* 93 F.R.D. 35, 41 (D.D.C.1981); *Richards of Rockford, Inc. v. Pacific Gas & Elec. Co.,* 71 F.R.D. 388 (N.D. Cal.1976). Thus, we think rules 26 and 45 are broad enough to accommodate Dr. Herbst's claims, and we need not reach any constitutional questions.

14. In asserting that his research is confidential, Dr. Herbst implicates an interest explicitly protected by Fed.R.Civ.P. 26(c)(7).

15. They are Robert Scully of the Harvard Medical School, Dr. Leonard T. Kurland of the Mayo Clinic, Dr. William M. Haenszel of the University of Illinois School of Public Health, Dr. Leon Gordis of Johns Hopkins University School of Hygiene and Public Health, and Dr. Philip Cole of the University of Alabama School of Public Health.

16. They are Dr. Kenneth L. Noller of the Mayo Clinic, Dr. Raymond H. Kaufman of the Baylor College of Medicine, and Dr. Hugh R.K. Barber in private practice in New York City.

17. Squibb's reliance on *Wright v. Jeep Corp.,* 547 F.Supp. 871 (E.D.Mich.1982) is misplaced since there no showing was made that the requested data was confidential. *See id.* at 875–76. Moreover, there the data sought underlay a study that had already been published and that would be used at trial on the merits. *See id.*

18. This regulation originated in the recommendations of the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research. *See* 46 Fed.Reg. 8385–86 (1981); 44 Fed.Reg. 47,691 (1979). The commission, in making this recommendation, had specifically mentioned the vulnerability of research data to subpoena. *See* 43 Fed. Reg. 56,181–82 (1978).

has also recognized the importance of confidentiality. It requires that all data of the Illinois Department of Public Health relating to medical study for the purpose of reducing morbidity or mortality or improving patient care shall be "strictly confidential." Ill.Rev.Stat. ch. 51, § 101 (1981). Improper disclosure of this data is a misdemeanor. *Id.* § 105. The data in the Registry has been designated as data of the Illinois Department of·Public Health subject to the statute.[19]

■ That we must weigh the burden on Dr. Herbst imposed by the breach of confidentiality Squibb seeks cannot be doubted. A research project to which Dr. Herbst has devoted the last decade of his life is jeopardized by this subpoena. Moreover, it is not just Dr. Herbst's interest that is at stake. If the Registry is destroyed, all society will be the poorer. There is undoubtedly a compelling social interest in promoting research. *See Dow Chemical Co. v. Allen,* 672 F.2d 1262, 1274–77 (7th Cir.1982).[20] If the Registry is destroyed, then a unique and vital resource for learning about the inci-

dence, causes and treatment of adenocarcinoma will be lost.

Moreover, there are societal interests in the free flow of information that are at stake here. Because courts recognize that the free flow of information which is guaranteed by the first amendment [21] is jeopardized when assurances of confidentiality are breached, they have held that requiring disclosure of confidential information threatens the interests protected by the first amendment.[22] If the Registry is subverted by Squibb's subpoena, and similar research projects dependent on confidentiality chilled, then this important social interest will be jeopardized.

While we have found few cases on point, *see* cases cited p. 499, *supra,* it seems clear that the law protects these interests. Three particular areas of the law come to mind. First, the lower federal courts have nearly universally concluded that where access is sought to a journalist's confidential sources, the first amendment will not countenance a breach of confidentiality unless the need for

---

19. Squibb argues that the Illinois statute is inapplicable to the Registry, contending that the statute applies only to data used for peer review in hospitals. While it is true that a purpose of the statute was to assure the confidentiality of the peer review process, *see Memorial Hosp. for McHenry County v. Shadur,* 664 F.2d 1058, 1062 (7th Cir.1982) (per curiam); *Matviuw v. Johnson,* 70 Ill.App.3d 481, 486, 26 Ill.Dec. 794, 388 N.E.2d 795, 799 (1979); no case has held that that is the *only* purpose of the statute. On its face, the statute reaches the Registry; the language does not require that the material be used for peer review to be protected by the statute. We will not construe the statute to be narrower than its plain language indicates absent a compelling showing based on the legislative history which has not been made here.

20. *See generally Regents of the University of California v. Bakke,* 438 U.S. 265, 311–14, 98 S.Ct. 2733, 2759–60, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.); *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967); *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957).

21. "Congress shall make no law ... abridging freedom of speech, or of the press ...." U.S. Const. amend. I.

22. *See Marrese v. American Academy of Orthopaedic Surgeons,* 692 F.2d 1083, 1088–89 (7th Cir.1982); *Zerilli v. Smith,* 656 F.2d 705, 710–11 (D.C.Cir.1981); *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 594–96 (1st Cir.1980); *United States v. Criden,* 633 F.2d 346, 355–56 (3d Cir.), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1980); *United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir.), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1980); *Riley v. City of Chester,* 612 F.2d 708, 714–15 (3d Cir.1979); *Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433 (10th Cir.1977); *Baker v. F & F Investment,* 470 F.2d 778, 782 (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *United States v. Doe,* 460 F.2d 328, 333–35 (1st Cir.1972) (*In re Popkin*), *cert. denied,* 411 U.S. 909, 93 S.Ct. 1527, 36 L.Ed.2d 199 (1973); *United States v. Hubbard,* 493 F.Supp. 202, 205 (D.D.C.1979); *Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Co.,* 455 F.Supp. 1197, 1202 (N.D.Ill.1978); *Apicella v. McNeil Laboratories, Inc.,* 66 F.R.D. 78, 83–85 (E.D.N.Y.1975); *Gilbert v. Allied Chemical Corp.,* 411 F.Supp. 505, 508 (E.D.Va.1976); *United States v. Doe,* 332 F.Supp. 938, 940 (D.Mass.1971) (*In re Falk*).

the disclosure is carefully weighed against the injury to the free flow of information that would result from the disclosure.[23] Second, courts have said that the burden imposed by the disclosure of confidential business information or trade secrets should be weighed when considering discovery requests.[24] Third, courts have held that when

**23.** *See McGraw-Hill, Inc. v. Arizona,* 680 F.2d 5 (2d Cir.1982) (*In re Petroleum Products Antitrust Litigation*) (per curiam); *Zerilli v. Smith,* 656 F.2d 705, 710–15 (D.C.Cir.1981); *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 593–99 (1st Cir.1980); *United States v. Criden,* 633 F.2d 346, 355–60 (3d Cir.), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1980); *United States v. Cuthbertson,* 630 F.2d 139 (3d Cir.), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1980); *Miller v. Transamerican Press, Inc.,* 621 F.2d 721 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); *Riley v. City of Chester,* 612 F.2d 708 (3d Cir.1979); *Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433 (10th Cir. 1977); *Farr v. Pitchess,* 522 F.2d 464 (9th Cir. 1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976); *United States v. Steelhammer,* 539 F.2d 373 (4th Cir.1976), *modified en banc,* 561 F.2d 539 (1977); *Carey v. Hume,* 492 F.2d 631 (D.C.Cir.), *cert. dismissed,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974); *Baker v. F & F Investment,* 470 F.2d 778 (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *Garland v. Torre,* 259 F.2d 545 (2d Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958); *United States v. Blanton,* 534 F.Supp. 295 (S.D.Fla. 1982); *DeRoburt v. Gannett Co.,* 507 F.Supp. 880 (D.Haw.1981); *Los Angeles Mem. Coliseum Comm'n v. National Football League,* 89 F.R.D. 489 (C.D.Cal.1981); *Montezuma Realty Corp. v. Occidental Petroleum Corp.,* 494 F.Supp. 780 (S.D.N.Y.1980) (*In re* Forbes Magazine); *United Liquor Co. v. Gard,* 88 F.R.D. 123 (D.Ariz.1980); *United States v. Hubbard,* 493 F.Supp. 202 (D.D.C.1979); *Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Co.,* 455 F.Supp. 1197 (N.D.Ill.1978); *Anderson v. Nixon,* 444 F.Supp. 1195 (D.D.C.1978); *Altemose Construction Co. v. Building & Construction Trades Council,* 443 F.Supp. 489 (E.D.Pa.1977); *Gilbert v. Allied Chemical Corp.,* 411 F.Supp. 505 (E.D.Va.1976); *Loadholtz v. Fields,* 389 F.Supp. 1299 (M.D.Fla.1975); *Apicella v. McNeil Laboratories,* 66 F.R.D. 78, 85 (E.D.N.Y. 1975); *Democratic Nat'l Com. v. McCord,* 356 F.Supp. 1394 (D.D.C.1973); *Adams v. Associated Press,* 46 F.R.D. 439 (S.D.Tex.1969), *cert. dismissed,* 402 U.S. 901, 91 S.Ct. 1266, 28 L.Ed.2d 642 (1971). *But cf. United States v. Liddy,* 354 F.Supp. 208 (D.D.C.) (no privilege to resist criminal defendant's subpoena which seeks material relevant to his defense), *denial of stay suspended,* 478 F.2d 586 (D.C.Cir.1972) (per curiam). *But see In re Lewis,* 377 F.Supp. 297 (C.D.Cal.1977). The Supreme Court's only encounter with this issue was in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). There, the five-member majority held that a reporter could not resist a grand jury subpoena that called for disclosure of confidential sources. However, the Court did note that no showing had been made that disclosure would have a substantial impact on the flow of information in that case. *See id.* at 691–99, 92 S.Ct. at 2661–65. Moreover, it noted that the first amendment limited grand juries when their investigations become abusive. *See id.* at 707–08, 92 S.Ct. at 2669–70. The crucial fifth vote came from Justice Powell, who explained that in his view, the first amendment did require case-by-case balancing of needs and burdens. *Id.* at 710, 92 S.Ct. at 2671 (concurring opinion). Since four dissenters were prepared to recognize at least a qualified first amendment privilege, *see id.* 743, 92 S.Ct. at 2681 (Stewart, J., dissenting), 711–15, 92 S.Ct. at 2686–88 (Douglas, J., dissenting), it appears that a majority of the Court held that the burdens caused by disclosure must be weighed. Also, a number of courts have held that *Branzburg* rests on the unique role played by the grand jury, and has no application outside of that context. *See Zerilli v. Smith,* 656 F.2d 705, 711 (D.C.Cir.1981); *Miller v. Transamerican Press, Inc.,* 621 F.2d 721, 725 (5th Cir. 1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); *Riley v. City of Chester,* 612 F.2d 708, 714 (3d Cir.1979); *Carey v. Hume,* 492 F.2d 631, 635–36 (D.C.Cir.), *cert. dismissed,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974); *Baker v. F & F Investment,* 470 F.2d 778, 784–85 (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Co.,* 455 F.Supp. 1197, 1201 (N.D.Ill.1978); *Gilbert v. Allied Chemical Corp.,* 411 F.Supp. 505, 508–10 (E.D.Va.1976); *Loadholtz v. Fields,* 389 F.Supp. 1299, 1301–02 (M.D.Fla.1975).

**24.** *See Federal Open Market Com. v. Merrill,* 443 U.S. 340, 355–56, 362–63, 99 S.Ct. 2800, 2809–10, 2813, 61 L.Ed.2d 587 (1979); *United States v. United Fruit Co.,* 410 F.2d 553 (5th Cir.), *cert. denied,* 396 U.S. 820, 90 S.Ct. 59, 24 L.Ed.2d 71 (1969); *Covey Oil Co. v. Continental Oil Co.,* 340 F.2d 993, 999 (10th Cir.1964), *cert. denied,* 380 U.S. 964, 85 S.Ct. 1110, 14 L.Ed.2d 155 (1965); *A.H. Robins Co. v. Fadely,* 299 F.2d 557 (5th Cir.1962); *International Union of Electrical Workers v. Westinghouse Elec. Corp.,* 91 F.R.D. 277, 279–80 (D.D.C.1981); *Davis v. General Motors Corp.,* 64 F.R.D. 420 (N.D.Ill.1974); *Triangle Ink & Color Co. v. Sherwin-Williams Co.,* 61 F.R.D. 634 (N.D.Ill.1973); *Maritime Cinema Serv. Corp. v. Movies En Route, Inc.,* 60 F.R.D. 587, 590 (S.D.N.Y.1973); *Struthers Sci-*

the disclosure of the identities of confidential governmental informants is sought in discovery, the burden this places on the social interest in the free flow of information to law enforcement authorities must be weighed.[25] In each of these contexts, courts have recognized that the disclosure of confidential information may jeopardize important societal interests in the flow of information, and required that this burden be weighed. We think we must do no less here.

The balance in this case tips in favor of Dr. Herbst. Squibb's need for the evidence is speculative and uncertain. Its essentially private interest in defending itself is outweighed by the compelling social interest in preventing harm to the Registry and the vital work it conducts. Leading authorities and actual contributors to the Registry have sworn that the Registry will be little short of devastated if confidential information in the Registry is disclosed to outsiders, such as Squibb. Squibb has responded with no affidavits of experts at all, but merely the unsworn speculations of its lawyer. That is not good enough. We will not jeopardize the vital mission of the Registry, and future of the medical profession's ability to understand and combat this truly dreaded and dreadful disease for the sake of the speculative and uncertain interest Squibb asserts.

Squibb suggests that confidentiality can be maintained by deleting names from the material disclosed to it, at its expense. Dr. Herbst responds that this task is herculean and could not be completed by the date of trial on the merits. Moreover, he explains

that so much of the material in the Registry contains individualized information that patients and doctors could be identified even if names were deleted. In any event, Squibb submits no affidavits from experts stating that such a procedure would not jeopardize the Registry. The work of the Registry is too important to be risked on the basis of counsel's speculations. Squibb has not made an adequate showing that deletions of names would protect the Registry. Without such a showing, we will not chance the possible chilling effect such a disclosure might have on future contributors to the Registry.[26]

The second interest forwarded by Dr. Herbst involves the "premature" disclosure of the data in the Registry. The subpoena calls for production of data in a study that is still in progress. Moreover, it calls for the production of all analyses of the data, including drafts of articles, no matter how tentative. This, Dr. Herbst argues, would place a substantial burden on researchers. The affidavits submitted by Dr. Herbst describe the problems created when research is prematurely disclosed. For one thing, premature disclosure of data can undermine an ongoing study by exposing information before it is fully analyzed.

Disclosure of information from ongoing epidemiological research can seriously undermine the study since premature disclosure of information, before valid conclusions can be reached by the researchers, may suggest faulty conclusions. These in turn may improperly discredit the study. On the other hand, given an opportunity to complete the research unobstructed by

entific & Int'l Corp. v. General Foods Corp., 51 F.R.D. 149 (D.Del.1970); Vogue Instrument Corp. v. Lem Instruments Corp., 41 F.R.D. 346 (S.D.N.Y.1967).

25. See Westinghouse Elec. Corp. v. City of Burlington, 351 F.2d 762, 767–71 (D.C.Cir.1965); Doe v. United States Civil Serv. Comm'n, 483 F.Supp. 539, 578–79 (S.D.N.Y.1980); United States v. Real Estate Bd., 59 F.R.D. 637, 640–41 (E.D.Mo.1973); Hodgson v. Keeler Brass Co., 56 F.R.D. 126 (E.D.Mich.1972); United States v. Aluminum, Ltd., 268 F.Supp. 758, 761–62 (D.N.J.1966). Cf. Halperin v. Kissinger, 401 F.Supp. 272 (D.D.C.1975) (President's execu-

tive privilege), rev'd as to grant of summary judgment, 606 F.2d 1192 (D.C.Cir.1979), aff'd in part by an equally divided court and cert. dismissed in part, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981).

26. Squibb does not suggest that the material produced under the subpoena be subject to some form of protective order to ensure its confidentiality. In any event, we would not be inclined to enter such an order without a substantial showing that an order could be drafted which would not jeopardize the future of the Registry.

disclosure request[s], would have the greatest likelihood of achieving tested and supported conclusions. Any forced premature disclosure could subject the researchers to professional ridicule and criticism.

Affidavit of Leonard T. Kurland ¶ 13. *See also* Affidavit of Leon Gordis ¶ 14; Affidavit of Arthur L. Herbst ¶ 29. For another, disclosure of tentative analysis of data and drafts of articles can have an adverse impact on the abilities of researchers to exchange their thoughts and speculations about ongoing research.

Epidemiological investigators, and indeed medical investigators in general, pursuing the spirit of scientific inquiry, often speculate, hypothesize and draw possible and probable conclusions as they probe various questions related to their research. Freedom to proceed in this manner requires confidentiality. Involuntary disclosure of this uninhibited communication among scientists to parties that are not participants in the research demolishes the freedom of thought and interchange of ideas that is so essential to productive research. Also, interpretation of the speculations, hypotheses, and possible or probable conclusions by outsiders carries a serious risk of being faulty, resulting in medical misinformation and possibly unjustifiably discrediting the investigators.

Affidavit of Robert E. Scully ¶ 9.

This sort of burden on Dr. Herbst is also entitled to some weight.[27] For example, in *United States v. Allen,* 494 F.Supp. 107 (W.D.Wis.1980), *aff'd sub nom. Dow Chemical Corp. v. Allen,* 672 F.2d 1262 (7th Cir. 1981), the district court observed,

I take judicial notice that it would be a substantial burden on respondents to force them to produce the information requested from the [ ] studies which are not near completion and which have not been subjected to peer review. In the early stages of any research project there are likely to be false leads or problems which will be resolved in the course of the study with no ultimate adverse effect on the validity of the study. To force production of all information demanded by the subpoenas is likely to jeopardize the study by exposing it to the criticism of those whose interests it may ultimately adversely affect, before there has been an opportunity for the researchers themselves to make sure the study is the result of their best efforts. This is not the kind of burden which can be lightened by a protective order. Putting this study in jeopardy would be a heavy burden not only on those involved in the research, but also on the public which has helped to fund it through tax money and which ultimately stands to gain from knowledge of the final results.

*Id.* at 113. The court of appeals fully approved of this approach. *See* 672 F.2d at 1273–74.[28] The court went on to hold that premature disclosure creates a substantial "chilling effect" on the first amendment rights of researchers to receive and publish information. *See id.* at 1273–74. As a result, the court affirmed the district court's decision to quash the subpoena.

We think that the burden created by the requested premature disclosure of Dr. Herbst's data and analyses adds whatever additional weight is required to quash the subpoena. While we think the confidentiality issue alone tips the scale in his favor, the additional burden created by the premature disclosure resolves all doubts as to the appropriate disposition of Dr. Herbst's motion.

---

**27.** The interest in confidentiality asserted here is similar, we think, to a lawyer's interest in maintaining the confidentiality of his or her work product. That interest, of course, is protected by Fed.R.Civ.P. 26(b)(3).

**28.** Squibb claims that *Dow* is distinguishable because it deals with an administrative subpoena under § 6(d) of the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136d(d) (1976), which is governed by the standard of

*United States v. Morton Salt Co.,* 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950) rather than rules 26 and 45. However, as *Dow* points out, *Morton Salt* gives courts even less discretion to quash subpoenas than do the civil rules. Nevertheless, *Dow* concluded that courts can still inquire into burdensomeness even under *Morton Salt. See* 672 F.2d at 1266–70. That is the same inquiry we make here. Thus, *Dow* is relevant to the task we face in this case.

Insofar as Squibb's subpoena requests only records relating to plaintiffs and their mothers, we reach a different result, however. No contention is made that these records are privileged under applicable law. Moreover, since plaintiffs have received notice of Squibb's subpoena, and are represented by their own counsel, it should be they, and not Dr. Herbst, who asserts whatever privilege may exist as to their own records in the Registry. No showing is made that if only the individual records of the person who has brought a DES suit are disclosed to those who have been sued, the Registry or Dr. Herbst's research would be in any way jeopardized. Moreover, the parties inform us that in the underlying litigation, plaintiffs have freely disclosed all of their relevant medical records. Thus, it appears that plaintiffs themselves do not consider this information "confidential" and do not wish to assert whatever privileges they may have with respect to their own records. Therefore, we think Dr. Herbst should disclose any records or other information in his custody, control or possession which pertain solely to plaintiffs or their mothers.

Accordingly, the motion to quash is granted in part and denied in part in accordance with the views expressed herein.