462 So.2d 1188 (1985)
PROCTER & GAMBLE COMPANY, a Foreign Corporation; Procter & Gamble Paper Products Company, a Foreign Corporation and Procter & Gamble Distributing Company, a Foreign Corporation Licensed to Do Business in Florida, Petitioners,
v.
Victoria B. SWILLEY and Roger Swilley, Respondents.
No. BA-290.
District Court of Appeal of Florida, First District.
January 15, 1985.
*1190 Stephen E. Day, Taylor, Day, Rio & Mercier, Jacksonville, and Thomas S. Calder, Frank C. Woodside, III, and John E. Jevicky,
Dinsmore & Shohl, Cincinnati, Ohio, for petitioners.
Dominic M. Caparello, Robert Scott Cox, and Anne Longman, Messer, Rhodes & Vickers, Tallahassee, for respondents.
Bronson C. La Follette, Atty. Gen., and LeRoy L. Dalton, Asst. Atty. Gen. of Wis., Madison, Wis., for amicus curiae Merlin S. Bergdoll.
SHIVERS, Judge.
Petitioners seek review by certiorari of a non-final order of the trial court which grants respondents discovery of research and related documents in petitioners' possession. We find that the trial court's order departs from the essential requirements of law to the extent it permits respondents to discover research and related documents that are claimed by petitioners to be work product. That portion of the trial court's order therefore is quashed. We affirm that part of the trial court's order that permits respondents to discover research and related documents received by petitioners from outside researchers.
This case involves a product liability action instituted by the respondents, plaintiffs in the proceedings before the trial court, against petitioners, defendants below. The petitioners are various Procter & Gamble companies (hereinafter referred to as P & G) and respondents are Victoria Swilley and her spouse, Roger Swilley. Mrs. Swilley was hospitalized in January and August of 1980 for, allegedly, toxic shock syndrome (hereinafter referred to as TSS). Mrs. Swilley contends that she contracted TSS as a result of using Rely tampons.[1] Rely tampons are a product that was manufactured and distributed by P & G prior to P & G's withdrawal of this product from the market in September, 1980.
According to the unrebutted affidavits and exhibits submitted to the trial court by P & G, the following events, as pertains to this case, followed P & G's decision to withdraw Rely tampons from the market.[2] In October, 1980, at the direction of counsel, P & G formed a special research team drawn from P & G's in-house scientists and staff personnel called "The Toxic Shock Syndrome Research Group." This group of scientists and personnel was established subsequent, and in response, to the numerous lawsuits that had begun to be filed, *1191 and continue to be filed, against P & G with respect to the alleged connection between TSS and the use of Rely tampons. The specific purpose in establishing this team of research personnel, allegedly, was, and is, to investigate the cause of TSS in order to assist defense counsel in defending against the TSS lawsuits that are being filed against P & G. This research team was put under the direction and control of defense counsel. No project allegedly is undertaken by this in-house research team without defense counsel's prior consent and approval.
In addition to establishing an in-house research team, P & G began reviewing applications for funding, and began funding, scientists at various research institutions throughout the world in connection with research into TSS. Applications for this funding are reviewed on an annual basis by P & G. Dr. Merlin Bergdoll, a prominent microbiologist at the University of Wisconsin, is one of the individuals who has received, and continues to receive, funding for his research into TSS from P & G.
The terms of Dr. Bergdoll's grant, allegedly indicative of the other grants given by P & G to outside researchers, provide that Dr. Bergdoll and P & G are to keep in close contact with each other through frequent correspondence and mutual visits at each other's investigative sites. P & G is to have full access to the records and measurements comprising the data obtained in Dr. Bergdoll's study. Dr. Bergdoll, however, maintains full rights to any publication(s) resulting from his research, although he is required to submit his proposed publication(s) to P & G for review and comment prior to publication. To date, P & G has contributed funds of more than three million dollars, at over 20 research institutions, in promulgation of this outside research into TSS.
Pursuant to the discovery process, respondents attempted to have P & G voluntarily produce the documents in P & G's possession relating to its in-house research and the TSS research documents in P & G's possession received from outside researchers. In particular, respondents requested that P & G produce the studies in its possession received from Dr. Bergdoll. P & G refused, claiming that the documents prepared by P & G's in-house research team, and in the in-house research team's notes and memoranda concerning the research received from outside researchers, are its (P & G's) work product. As to the outside research in P & G's work product, it was nevertheless protected from discovery because this research is preliminary in nature and, therefore, not reasonably calculated to lead to admissible evidence. Dr. Bergdoll filed an affidavit in support of P & G's position. Respondents filed a motion to compel.
Hearings were held on respondents' motion to compel on April 4, 1984, and June 19, 1984. At these hearings, respondents asserted through counsel that even assuming that P & G's in-house TSS research is work product, which respondents did not concede, this research was discoverable under the exception to the work product rule that work product is discoverable when a party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. Respondents' counsel asserted that it was an undue hardship on respondents to obtain the substantial equivalent of P & G's in-house research because of the financial discrepancies between the parties. In particular, counsel asserted that it was ridiculous to think that respondents, who have limited financial resources, could finance the reproduction of the research performed by P & G's in-house research team. As to the research in P & G's possession furnished by outside researchers, respondents' counsel argued that this research is relevant to their case and that there is no academic privilege in Florida that would prevent the discovery of this research.
In response to respondents' arguments, P & G's counsel represented that there were numerous institutions and individuals with available research on TSS, including the Center for Disease Control in Atlanta, *1192 the State of Minnesota's Health Department, and two professors from New York University. P & G's counsel noted that these latter two individuals had testified against P & G in other TSS cases. As to the outside research in P & G's possession, P & G's counsel asserted, in addition to the argument that this research is preliminary and not relevant, that the compelled disclosure of this research would have an adverse effect on independent scientific research into medical questions. P & G argued that researchers would tend to confine their work to projects unrelated to legal actions, if they knew that their preliminary research could be disclosed to parties involved in litigation.
In the order on review, the trial court compelled the production of P & G's in-house TSS research and the outside TSS research documents in P & G's possession, specifically including, as pertains to the in-house research, P & G's in-house scientists' notes and memorandum concerning the outside research, and, as pertains to the outside research, Dr. Bergdoll's research. The court found that the documents claimed by P & G to be work product were subject to the exception to the work product rule of need and the failure to obtain the substantial equivalent of these materials without undue hardship because of the magnitude of P & G's in-house research and the financial resources of P & G. As to the outside research in P & G's possession, the trial court found that the possible inconclusive nature of this research went more to admissibility, then discoverability. The trial court's order provides for in camera inspection by the trial court of any documents that petitioners believe to be privileged.
At the outset, respondents argue that this case does not meet the stringent requirements for granting a petition for writ of common law certiorari. In partial support of their position, respondents cite cases, not involving the discovery context, that stand for the proposition that common law certiorari is an extraordinary remedy that is rarely used to correct interlocutory orders. These cases are inapplicable to the instant case.
Respondents also state that the trial court's order carefully follows the requirements of the Florida discovery rules by not being overbroad or by failing to protect against the disclosure of trial counsel's thoughts and strategy. Although we agree with these statements, no contention has been raised by P & G that the trial court's order is contrary to the essential requirements of law on these grounds.
Finally, respondents admit that discovery orders may be reviewed by writ of certiorari. We agree. Non-final orders that permit discovery are a classic example of the type of interlocutory order that may be reviewed by writ of certiorari. See, e.g., Greyhound Lines, Inc. v. Jackson, 445 So.2d 1107 (Fla. 4th DCA 1984); City of Williston v. Roadlander, 425 So.2d 1175 (Fla. 1st DCA 1983); Marine Investment Co. v. Van Voorhis, 162 So.2d 909 (Fla. 1st DCA 1964). As stated in Boucher v. Pure Oil Co., 101 So.2d 408 (Fla. 1st DCA 1957) (after noting the rule that a court will review an interlocutory order only where it clearly appears that there is no full, adequate and complete remedy by appeal after final judgment available to the petitioner):
Considering this case in light of the foregoing rule we are of the view that the circumstances are such as to justify our review of the questioned order. If plaintiff is wrongfully required to answer defendant's interrogatories, she is beyond relief. We concede no means by which on appeal this court could extract such knowledge, once gained, from the mind of the defendant, for truly `the moving finger having writ moves on nor any appeal shall lure it back to cancel half a line.'
Id. at 410.
Next, respondents contend that we need not reach the question of whether the work product exception applies to P & G's in-house research, since, it is contended, this research is not P & G's work product. We disagree. Documents and tangible things prepared in anticipation of *1193 litigation or for trial by or for a party or by or for that party's representative, including his attorney, consultant, surety, indemnitor, insurer or agent, are a party's work product and, therefore, subject to qualified immunity from discovery. See Fla.R.Civ.P. 1.280(b)(2). Documents and tangible things prepared in the ordinary course of business, pursuant to public requirements unrelated to litigation, or at a time when the "mere likelihood" of litigation exists are not entitled to protection from discovery under the work product doctrine. See Cotton States Mutual Insurance Co. v. Turtle Reef Associates, Inc., 444 So.2d 595 (Fla. 4th DCA 1984). We hold that scientific or other technical documents or tangible things prepared in anticipation of litigation or for trial by or for a party or by or for that party's representative are not disqualified from constituting a party's work product. See Burlington Industries v. Exxon Corp., 65 F.R.D. 26, 41-42 (D.Md. 1974) (that court stating that work product includes as protected material those materials which are prepared by non-attorneys so long as the preparation is in anticipation of litigation or preparation for trial, and noting that documents should not be denied the protection of work product merely because the documents include technical data.)[3] Applying these principles to the instant case, in light of the sworn statements presented to the trial court by P & G, we find that the documents and intangible things prepared by P & G's in-house TSS research team are P & G's work product.[4]
Having determined that the documents and tangible things prepared by P & G's in-house research team are work product, we next must determine whether these materials are still discoverable pursuant to Fla.R.Civ.P. 1.280(b)(2). Rule 1.280(b)(2) *1194 provides that a party may obtain discovery of another party's work product only upon a showing that the party seeking discovery has need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. It is well established in Florida that absent this required showing of need and undue hardship to obtain the substantial equivalent of another party's work product by other means, a party's work product will remain immune from discovery. See, e.g., Scotchel Enterprises, Inc. v. Velez, 455 So.2d 1129 (Fla. 4th DCA 1984); Wackenhut Corp. v. Crant-Heisz Enterprises, Inc., 451 So.2d 900 (Fla. 2nd DCA 1984); Winn-Dixie Stores, Inc. v. Nakutis, 435 So.2d 307 (Fla. 5th DCA 1983); pet. for review denied, 446 So.2d 100 (Fla. 1984); Cavalere v. Graham, 432 So.2d 756 (Fla. 5th DCA 1983); Alachua General Hospital, Inc. v. Zimmer USA, Inc., 403 So.2d 1087 (Fla. 1st DCA 1981); Insurance Company of North America v. Noya, 398 So.2d 836 (Fla. 5th DCA 1981); Transamerica Insurance Co. v. Maze, 318 So.2d 200 (Fla. 2d DCA 1975). Also well established in Florida is the principle that the unsworn analysis of a party's attorney and/or a bare assertion of need and undue hardship to obtain the substantial equivalent insufficient to satisfy this showing. See, e.g., Chrysler Corp. v. Miller, 450 So.2d 330 (Fla. 4th DCA 1984); Winn-Dixie Stores, Inc. v. Nakutis, supra; Cavalere v. Graham, supra. See generally Westinghouse Elevator Co. v. DFS Construction Co., 438 So.2d 125 (Fla. 2d DCA 1983); Leon Shaffer Golnick Advertising, Inc. v. Cedar, 423 So.2d 1015 (Fla. 4th DCA 1982). It also has been indicated that the showing of need encompasses a showing of diligence by the party seeking discovery of another party's work product. See Transamerica Insurance Co. v. Maze, 318 So.2d 200, 201 (Fla. 2d DCA 1975). See also Alamo Rent-A-Car v. Loomis, 432 So.2d 746 (Fla. 4th DCA 1983); H. Trawick, Jr., Florida Practice and Procedure § 16-3 (1983).
Applying these principles to the case at hand, we find that respondents failed to make the showing required by Rule 1.280(b)(2). Our determination is not that respondents cannot, or may not be able to, make the requisite showing. Rather, our holding simply is that respondents failed to make the requisite showing before the trial court.
Sub judice, the only presentation by respondents at the hearings on their motion to compel with respect to respondents' need of P & G's in-house TSS research in the preparation of their case and that respondents are unable to obtain without undue hardship the substantial equivalent of this research by other means was the unsworn analysis/argument of respondents' counsel. No sworn testimony, by live expert opinion testimony, affidavit, or otherwise, was presented to the trial court to support respondents' counsel's assertions. In particular, no showing was made by respondents as to why the research materials suggested by P & G, e.g., the Center for Disease Control studies, are not the substantial equivalent of P & G's in-house research and/or why it is impractical for respondents to obtain these studies without undue hardship. Moreover, no showing was made as to the extent of respondents' own diligence in preparing their case for trial, which showing would bear on respondents' need for P & G's in-house research.[5] Absent the prescribed showing of Rule 1.280(b)(2), P & G's work product should not have been ordered produced.
The trial court's stated reasons for permitting the discovery of the materials *1195 claimed by P & G to be its work product were the magnitude of P & G's in-house research and the resources of P & G, as opposed to the resources of respondents. However, based on the evidence presented to the trial court, we have no way of knowing whether other entities have performed studies on TSS of equal magnitude to that of P & G's in-house research team and, if such studies exist, why it would be impractical for respondents to obtain these studies without undue hardship. The burden was on respondents to make this showing. See Transamerica Insurance Co. v. Maze, 318 So.2d 200 (Fla. 2d DCA 1975). Respondents' counsel's bare assertion at the trial court level, and on appeal, that there is no substantial equivalent to the materials respondents seek and that no amount of diligence could produce such materials does not satisfy this burden.
We note that no showing was made by respondents that P & G has a monopoly on TSS research and, therefore, that TSS research is otherwise unavailable, or that P & G's in-house research is unique in other ways. If such a showing had been made, together with a showing that respondents have a compelling necessity for P & G's in-house research, then the financial ability of respondents to hire scientific experts to duplicate P & G's in-house research would be relevant on respondents' ability to obtain substantially equivalent research to P & G's by other means without undue hardship. However, without such a showing, we decline to assume what respondents' counsel term "the obvious."
Accordingly, that portion of the trial court's order that permits respondents to discover research and related documents that are claimed by P & G to be its work product is quashed. Our holding is without prejudice to respondents to renew their motion to compel.
Finally, we turn to P & G's contention that the trial court departed from the essential requirements of law by ordering the discovery of the documents and tangible things in P & G's possession received from outside researchers.[6] We disagree. Contrary to P & G's assertion, we find that these documents are relevant, that is, germane, to the subject matter of the pending action. Fla.R.Civ.P. 1.280(b)(1); Marine Investment Co. v. Van Voorhis, 162 So.2d 909, 910 (Fla. 1st DCA 1964); 8 C. Wright & A. Miller, Federal Practice and Procedure § 2008 (1970). We cannot say that these documents may not be considered reasonably calculated to lead to the discovery of admissible evidence. Accordingly, respondents are entitled to obtain discovery of these documents unless they are privileged. Fla.R.Civ.P. 1.280(b)(1).
However, at the present, there is no academic privilege in Florida. See Marshall v. Anderson, 459 So.2d 384 (Fla. 3d DCA 1984). We are not at liberty to create such a privilege. Id. Moreover, even if we were at liberty to create an academic privilege, we would not apply an academic privilege to the facts of this case.
Fundamental fairness dictates to us that respondents, a party, should be able to obtain the research and related documents furnished P & G, the opposing party, by "independent researchers." This set of facts distinguishes this case from the situation where research data has not been ordered disclosed because, in part, the research data was obtained from patients and doctors pursuant to the researcher's promise that it would remain confidential. See Andrews v. Eli Lilly & Co., supra, 97 F.R.D. 494 (N.D.Ill. 1983). We do not find a party's promise not to disclose a researcher's data, other than to its employees and attorneys for review and testing in defense of litigation to which the research relates, analogous to the situation in Andrews v. Eli Lilly & Co., supra. Rather, we find that the "right to every man's evidence" outweighs any alleged adverse effects that would result from the disclosure of the *1196 data received by P & G from outside researchers. Notably, the trial court ordered discovery of only the outside research and related documents in P & G's possession. The trial court also provided in its order for the filing of a protective order by P & G.
Accordingly, that part of the trial court's order that permits respondents to discover research and related documents received by P & G from outside researchers is affirmed.
Petitioners' writ of certiorari is granted in part. The trial court's order is quashed, in part, and affirmed, in part.
WENTWORTH and NIMMONS, JJ., concur.
NOTES
[1] Surprisingly, to us at least, neither party furnished us with a copy of the complaint in this case as part of the appendix to the respective parties' petition and response. We therefore are uncertain of the date the Swilleys brought their action against P & G. We glean from the transcript of the hearing on the Swilleys' motion to compel that their action was based on the theories of strict liability, breach of warranty, and/or negligence.
[2] P & G's decision to withdraw Rely tampons from the market apparently was in response, at least in part, if not to a greater extent, to statistical studies done by the Center for Disease Control in Atlanta showing a statistical relationship between tampon usage and TSS.
[3] Respondents ask us to treat scientific or other technical documents or tangible things prepared in anticipation of litigation by or for a party or by or for that party's representative differently from other documents and tangible things prepared by or for a party or that party's representative in anticipation of litigation. We decline to do so. We find no exception pertaining to scientific or other technical data in Rule 1.280(b)(2) which would disqualify these types of materials from qualifying as a party's work product. We decline to judicially carve out such an exception. We do not believe our ruling on this point will frustrate the ends of justice. A party seeking discovery of scientific or other technical data claimed by another party to be its work product will be able to obtain this data upon the showing required by Rule 1.280(b)(2).
[4] The salient unrebutted representations by P & G which lead us to our conclusion that the documents and tangible things prepared by P & G's in-house research team are P & G's work product are as follows. First, P & G represents, through the sworn statements of P & G's employees and others, that its in-house research team was formed in response, and subsequent, to the initiation of TSS litigation against P & G. It is alleged that the first TSS lawsuit was filed against P & G on August 17, 1980. From this we find that the documents and tangible things prepared by P & G's in-house research team were not prepared at a time when there was a "mere likelihood" that TSS litigation would be commenced against P & G.

Next, P & G represents that its in-house research team was developed as a research project separate and distinct from P & G's regular research programs and in direct response to defense counsel's efforts to defend against TSS litigation. P & G represents that its in-house research team would not have been established, but for the TSS litigation instituted against P & G. From this we find that the documents prepared by P & G's in-house research team were not prepared in P & G's ordinary course of business.
Although respondents suggested at the trial court level, and further suggest on appeal, that P & G conducted its in-house research on TSS pursuant to public requirements, there was no proof introduced supporting this assertion by respondents, only the statements of respondents' counsel. This is insufficient. See, e.g., Chrysler Corp. v. Miller, 450 So.2d 330 (Fla. 4th DCA 1984).
Finally, we note that we find unpersuasive respondents' argument that all of P & G's in-house research should be disclosed for use as impeachment, since P & G has agreed to timely disclose the in-house research that will be relied upon by the experts P & G intends to call at trial. This procedure should afford respondents the ability to sufficiently cross-examine P & G's experts. Moreover, we note that in 8 C. Wright & A. Miller, Federal Practice and Procedure § 2025 (1970), it is stated that a party's "mere surmise that he might find impeaching matter has been held not sufficient to justify production [of a party's work product]." See also United States v. Chatham City Corp., 72 F.R.D. 640, 643 (S.D.Ga. 1976).
[5] We make no determination as to the extent of respondents' diligence in preparing their case for trial. Respondents may have been very diligent. However, no showing of respondents' diligence was presented to the trial court. We consider such a showing significant, since a party should not be able to delve into another party's work product upon the simple filing of a motion to compel, and thereby benefit from that party's investigatory/preparatory efforts, without a showing why the requesting party has a compelling need for the opposing party's work product in preparing his or her case for trial.
[6] We have allowed Dr. Bergdoll to file an amicus memorandum in support of P & G's position.